T.C. Memo. 1997-65

UNITED STATES TAX COURT

ALLEN M. GLICK, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 15886-94.                    Filed February 4, 1997.

<u>Burton Chandler</u> and <u>James D. Masterman</u>, for petitioner.

<u>Barry J. Laterman</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

RUWE, <u>Judge</u>:  Respondent determined deficiencies in petitioner's Federal income tax, additions to tax, and a penalty as follows:

| | | Additions to Tax | | |
|---|---|---|---|---|
| Year | Deficiency | Sec. 6653(a)(1)(A) | Sec. 6653(a)(1)(B) | Sec. 6659 |
| 1987 | $738,211 | $38,002 | 50 percent of the interest due on $2,629 | $214,997 |

| | | Addition to Tax |
|---|---|---|
| Year | Deficiency | Sec. 6653(a)(1) |
| 1988 | $122 | $639 |

| | | Accuracy-Related Penalty |
|---|---|---|
| Year | Deficiency | Sec. 6662(a) |
| 1989 | $80,314 | $17,750 |

The issues for decision are:  (1) Whether petitioner is entitled to a charitable contribution deduction under section 170(a)[1] in the amount of $6 million for land he transferred to the Commonwealth of Massachusetts (the Commonwealth) in 1986; (2) whether petitioner is liable for additions to tax under section 6653(a) for the taxable years 1987 and 1988; (3) whether petitioner is liable for an addition to tax under section 6659 for the taxable year 1987; and (4) whether petitioner is liable for an accuracy-related penalty under section 6662(a) for the taxable year 1989.[2]

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]In the notice of deficiency, respondent also determined that petitioner is liable for additional interest in 1987 under

(continued...)

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The first and second stipulations of facts are incorporated herein by this reference.

Petitioner resided in Framingham, Massachusetts, when he filed his petition in this case. In 1981, petitioner purchased approximately 380 acres of real property (Eastleigh Farm) located primarily in Framingham, Massachusetts, with portions also in Marlborough and Southborough, Massachusetts.

In late 1983 or early 1984, Barry Walker and Kenneth Dallamora approached petitioner about the possibility of purchasing a portion of Eastleigh Farm for their company, Eastleigh Development Corp. (Eastleigh Development). On January 23, 1984, petitioner conveyed approximately 48.26 acres of Eastleigh Farm to Eastleigh Development. On September 28, 1984, petitioner also conveyed approximately 29.653 acres of Eastleigh Farm to Eastleigh Development. Eastleigh Development subdivided the parcels and built and sold homes on this property.

On March 22, 1984, in connection with the transfer of the two small parcels, petitioner and Eastleigh Development entered into an agreement whereby Eastleigh Development was to install a sewer pipeline (the Eastleigh Sewer Line) from its nearby

---

[2](...continued)
sec. 6621(c) for a substantial underpayment attributable to a tax-motivated transaction.

development to a location directly in front of Eastleigh Farm. The Eastleigh Sewer Line is an 8-inch gravity trunk line which is part of the sewer system for the town of Framingham. The Eastleigh Sewer Line connects to the Angelica pumping station, which was also built by Eastleigh Development during the development of the two smaller parcels.

Eastleigh Development extended the Eastleigh Sewer Line to Edmands Road in contemplation of a future purchase and development of the remaining Eastleigh Farm. In 1985, Eastleigh Development made an initial offer to purchase all petitioner's remaining property (approximately 270 acres) for $10 million plus 20 percent of the profit from the development of that property. Eastleigh Development had an agreement with Framingham Trust Co. to finance the purchase and development of this deal. Petitioner declined this initial offer.

In the fall of 1985, the Commonwealth approached petitioner concerning a possible acquisition by the Commonwealth of approximately 159.48 acres of Eastleigh Farm (the Property). With the exception of underground natural gas lines, this portion of Eastleigh Farm was unimproved rolling terrain with a combination of woodlands, open fields, wetlands, and a pond. Gilbert Bliss, director of the Division of Forests and Parks in the Commonwealth's Department of Environmental Management, informed petitioner that the Commonwealth was concerned about

losing land to developers and that it had a program underway to enlarge the State park system.[3]

In 1986, Eastleigh Development offered to purchase the same parcel of Eastleigh Farm being considered by the Commonwealth (the Property in issue).  Although this second offer by Eastleigh Development was for less land than its first offer, the terms of the offer were identical to the previous offer:  $10 million plus 20 percent of the profit from the development of the property.  Petitioner declined Eastleigh Development's second offer as well.

On May 27, 1986, petitioner granted the Commonwealth an option to buy the Property.  Petitioner hired Ronald B. Handverger of Handverger & Associates of Framingham, Massachusetts, to appraise the Property.  On September 30, 1986, Mr. Handverger appraised the Property at $12.5 million.

On October 29, 1986, petitioner conveyed the Property to the Commonwealth.  The consideration set forth in the deed for the Property was $6 million.  In addition, the Commonwealth granted petitioner a Special Use Permit allowing him to harvest hay on a 22.5-acre portion of the Property for 5 years.

On his 1986 Federal income tax return, petitioner valued the Property at $12 million, reporting a long-term capital gain of $5,986,499 on the sale portion of the transfer and a charitable contribution of $6 million reflecting the bargain portion of the

---

[3]The Commonwealth desired to purchase the Property and add it to the adjacent Callahan State Park.

transfer. Petitioner claimed a charitable deduction with respect to the bargain sale of the Property on his 1986 income tax return, with a carryover of the remaining amount on his 1987, 1988, and 1989 income tax returns. Respondent disallowed the entire charitable deduction claimed on petitioner's 1986 income tax return and subsequent carryover years.

OPINION

The primary issue for decision is the fair market value of the transferred property for purposes of determining the proper amount of petitioner's charitable contribution deductions. Petitioner bears the burden of proving that the fair market value of the transferred property exceeds the value determined by respondent in her notice of deficiency. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933); Estate of Gilford v. Commissioner, 88 T.C. 38, 50-51 (1987); McGuire v. Commissioner, 44 T.C. 801, 806-807 (1965).

Section 170 allows an individual to deduct charitable contributions, subject to certain percentage limitations, with a carryover of any excess contributions. See sec. 170(b), (d). If a charitable contribution is made in property other than money, the amount of the taxpayer's contribution is the fair market value of the property at the time of the contribution. Sec. 1.170A-1(c), Income Tax Regs. A taxpayer who makes a bargain sale to charity of long-term capital gain property is typically

entitled to a charitable contribution deduction equal to the difference between the fair market value of the property and the amount realized from the sale. Sec. 170(a)(1); Stark v. Commissioner, 86 T.C. 243, 255-256 (1986); Knott v. Commissioner, 67 T.C. 681 (1977); Waller v. Commissioner, 39 T.C. 665, 677 (1963). Section 1.170A-1(c)(2), Income Tax Regs., defines fair market value as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of relevant facts."

The parties have stipulated that charitable contributions to the Commonwealth qualify for a charitable contribution deduction pursuant to section 170(c)(1). Respondent further concedes that petitioner intended to make a gift to the Commonwealth of any excess value of the Property over the selling price. However, it is respondent's position that $6 million, together with the Special Use Permit, properly reflects the fair market value of the Property, and therefore, petitioner is not entitled to the charitable deductions claimed.

The fair market value of donated property as of a given date is a question of fact to be determined from the entire record. Symington v. Commissioner, 87 T.C. 892, 896 (1986); Zmuda v. Commissioner, 79 T.C. 714, 726 (1982), affd. 731 F.2d 1417 (9th Cir. 1984). Fair market value reflects the highest and best use of the property on the date of valuation. Stanley Works v.

Commissioner, 87 T.C. 389, 400 (1986).  The highest and best use of property is the realistic, objective potential use to which the property can be put.  The determination of fair market value is not dependent upon whether the property is actually being put to its highest and best use.  Here, the parties agree that the highest and best use for the Property is as an exclusive residential subdivision.

Petitioner's Experts

In this case, the parties have relied extensively on the testimony of expert witnesses to support their respective views on the fair market value.  Petitioner has submitted the reports of three appraisers:  (1) Ronald B. Handverger, (2) Martin C. Segel, and (3) Kenneth G. Dallamora.  Each of these experts stated that the fair market value of the Property was in excess of $12 million in October 1986.

Mr. Handverger has been actively engaged in the real estate profession for over 20 years.  He is a certified general real estate appraiser in the Commonwealth and the owner of Handverger & Associates, which is an appraisal consulting firm in the town of Framingham.  Mr. Handverger prepared the original appraisal report on the Property, which petitioner used in determining the value of the Property for his 1986 Federal income tax return. Mr. Handverger also prepared a revised report prior to trial.

At the outset, we note that respondent raised the issue of Mr. Handverger's censure by the Society of Real Estate Appraisers (the Society) in 1986 for violation of several sections of the Standards of Professional Practice and Conduct of that organization.[4]  The specific circumstances of Mr. Handverger's censure are not evident.  Mr. Handverger is still a licensed appraiser and a member of the Society of Real Estate Appraisers.  Therefore, we will recognize him as an expert witness.  Mr. Handverger valued the Property at $12.5 million as of September 30, 1986.[5]

Mr. Segel is also a certified general real estate appraiser in the Commonwealth of Massachusetts.  He has been in the appraisal business since 1959 and has experience appraising property requiring the approval of a subdivision plan, construction of roads, and unusual site conditions.  In his report, Mr. Segel stated that the Property's fair market value immediately prior to October 15, 1986,[6] was $12,225,000.

---

[4]In particular, sec. 5.0000 of the Society's Standards of Professional Practice and Conduct requires that each member "Render properly developed, unbiased and objective value opinions, and render properly developed, unbiased and objective analyses."

[5]Mr. Handverger's original appraisal report, dated Sept. 30, 1986, as well as his updated report, dated Sept. 19, 1995, both state that the Property had a fair market value of $12.5 million as of Sept. 30, 1986.

[6]Mr. Segel testified that he valued the Property on Oct. 15, 1986, because petitioner signed the deed on this date, and he
(continued...)

Mr. Dallamora is a registered appraiser in the Commonwealth. His experience in real estate sales, and in particular, real estate development in this particular location, is superior to that of all other experts in this case. Mr. Dallamora is the president of both Dallamora Realtors, Inc., and Dallamora Brothers Construction, a residential land development and construction company in Framingham, Massachusetts. Mr. Dallamora's construction company was responsible for obtaining approval, developing sites, and constructing over 500 single-family homes and condominium units throughout Massachusetts. Mr. Dallamora stated that the Property had a fair market value of $12.5 million in 1986.

Each of petitioner's experts relied upon a subdivision plan drafted by Joseph R. Sullivan of MacCarthy & Sullivan Engineering, in Framingham, Massachusetts. Mr. Sullivan is an engineer and a registered professional surveyor who has prepared subdivision plans for approximately 400-500 residential subdivisions, many in the town of Framingham. Mr. Sullivan prepared an initial subdivision plan for the Property at the request of Eastleigh Development. This initial plan, paid for by Eastleigh Development in contemplation of a future purchase of

---

[6](...continued)
assumed this was the date of transfer. However, the parties have stipulated that the Property was transferred on Oct. 29, 1986.

the Property, contained 110 lots.[7]  Mr. Sullivan subsequently revised his initial plan and testified that the Property could be subdivided into 114 house lots.  All petitioner's experts relied on this final version of the subdivision plan.

Respondent's Experts

Respondent presented the valuation opinion of Jonathan H. Avery, a certified general real estate appraiser in the Commonwealth.  Mr. Avery submitted a report dated September 22, 1995, which valued the Property at $7.5 million as of October 29, 1986.  On October 23, 1995, Mr. Avery updated his report to reflect changes made to the subdivision plan that he originally relied upon.  As a result of these changes, Mr. Avery increased his estimate of the Property's fair market value from $7.5 million to $8.3 million.

Warren F. Flint, Jr., prepared both subdivision plans that Mr. Avery relied upon.  Mr. Flint is the president and owner of Matlock Associates, a land planning and design firm in Lincoln Center, Massachusetts.  Although Mr. Flint has had some formal training in drafting subdivision plans and is also a registered landscape architect in the Commonwealth, he is not qualified to approve plans in the town of Framingham and has never submitted a subdivision plan to the Framingham Planning Board.

---

[7]Mr. Handverger's first valuation report was based on the initial subdivision plan prepared by Mr. Sullivan.

In addition to the subdivision plans, Mr. Flint prepared a detailed report analyzing the development potential of the Property. Mr. Flint's report includes an extensive soil analysis of the Property, as well as a summary of discussions with Framingham town officials and consultants regarding the development of the Property's sewer system. Mr. Flint's revised subdivision plan shows that the Property could be subdivided into 107 house lots.[8]

Before turning to an analysis of the divergent expert opinions, we note that, as the trier of fact, the Court must weigh the evidence presented by the experts in light of their demonstrated qualifications in addition to all other credible evidence. Estate of Christ v. Commissioner, 480 F.2d 171, 174 (9th Cir. 1973), affg. 54 T.C. 493 (1970). However, we are not bound by the opinion of any expert witness when that opinion is contrary to our judgment. Estate of Kreis v. Commissioner, 227 F.2d 753, 755 (6th Cir. 1955), affg. T.C. Memo. 1954-139; Chiu v. Commissioner, 84 T.C. 722, 734 (1985). Rather, we may accept or reject expert testimony as we find appropriate in our best judgment. Helvering v. National Grocery Co., 304 U.S. 282, 294-295 (1938); Seagate Tech., Inc. & Consol. Subs. v. Commissioner, 102 T.C. 149, 186 (1994). Moreover, even if we accept the general methodology of an expert witness, we may reject that

[8]Mr. Flint's original subdivision plan contained only 96 house lots.

expert's ultimate conclusion if unsupported by the record. Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315, 1331 (5th Cir. 1987), affg. T.C. Memo. 1985-267.

## Valuation Methodology

The parties presented two alternative methods of valuing the Property: (1) The comparable sales method (CSM); and (2) the subdivision development method (SDM). The CSM involves gathering information on sales of property similar to the subject property, then making adjustments for various differences between the "comparables" and the property being appraised. Estate of Spruill v. Commissioner, 88 T.C. 1197, 1229 n.24 (1987).

The SDM determines the value of undeveloped land by treating the land as if it were subdivided, developed, and sold. From the proceeds of sale, development costs are then subtracted. Finally, the expected net proceeds are discounted over the estimated period required for market absorption of the developed lots in order to determine the amount a developer would pay for the undeveloped property; i.e., the property's fair market value. Branch v. Commissioner, T.C. Memo. 1987-321.

In his report, Mr. Avery used both methods to value the Property, relying primarily on the SDM. Although he used the CSM for support, Mr. Avery admitted that "none of the parcels analyzed had the locational or physical attributes of the subject property." As a result of these differences, Mr. Avery made

significant adjustments to each of the parcels used as comparables. The SDM was also the principal method applied by petitioner's experts. Based on the lack of true comparable sales in the area, and both parties' primary reliance on the SDM, we too rely primarily on the SDM in determining the value of the Property.

Fair Market Value Under the Subdivision Development Method

Although all the experts used the SDM in determining the fair market value of the Property, each used slightly different factors and values in his analysis. Of the four experts, Mr. Avery presented the most comprehensive SDM in terms of the number of pertinent factors considered. Therefore, we find his methodology appropriate as a general framework for our determination of the value of the Property.

Many of the factors that make up the subdivision development analysis are determined by the individual expert's knowledge, experience, and judgment. As a result, many of the values assigned to these factors differ from expert to expert.[9] The

[9]However, the value differences among the expert reports for inflation rate, discount rate, and most of the development expenses are slight. Based on all the evidence presented, we determine the following values for these factors: (1) Inflation rate equals 12 percent per year; (2) discount rate equals 11 percent per year; (3) marketing expenses equal 5 percent of total sales; (4) real estate taxes equal $500 per lot; (5) legal expenses/closing costs equal $700 per lot; (6) engineering costs equal $1,500 per lot; and (7) developer's overhead and profit

(continued...)

significant differences between petitioner's experts and respondent's experts can be found in the following four factors: (1) The number of lots into which the property could have been divided; (2) the selling price of the developed lots; (3) the time required to sell the developed lots; and (4) the development expenses relating to sewage improvement and road construction. We will attempt to reconcile these differences in the experts' subdivision development analyses in reaching our determination as to the fair market value of the Property. In addition, we will determine what, if any, value should be allocated to the Special Use Permit.

We begin our determination by recognizing local conditions that would affect the real estate market at the time of the transfer. Both parties agree that 1985 and 1986 were extremely prosperous times in the eastern Massachusetts real estate market as prices for homes and lots reached record highs. Developers in the area aggressively sought land on which to create residential subdivisions. Moreover, during this time, there was full employment, interest rates were low, and substantial amounts of money were available for real estate loans. Although the real estate surge did not continue at this volatile pace, it is important to reflect the conditions existing at the time in a proper valuation of the Property, e.g., aggressive lot pricing, a

[9](...continued)
equals 15 percent.

healthy annual appreciation rate, and an aggressive sellout or absorption of the project.

Number of Lots

The first value difference that must be reconciled is the determination of the number of lots into which the Property could have been developed.  While both Mr. Flint and Mr. Sullivan were qualified as expert witnesses, we find that Mr. Sullivan's local experience and hands-on knowledge with respect to the development of property more persuasive.  Therefore, we give greater weight to Mr. Sullivan's subdivision plan, which obtains the maximum benefit of the available land.  However, Mr. Sullivan's plan employs an access road over a portion of land retained by petitioner.  Without an easement for this road, several of the lots would be inaccessible.  The record indicates that petitioner did not deed such access in his conveyance of the Property to the Commonwealth.[10]  Petitioner testified that he would have transferred such an easement if he had been requested to do so. Nevertheless, respondent argues that if the Property is appraised assuming access could be acquired, then there should be a

---

[10]Although petitioner did not grant the Commonwealth an easement for automobile traffic as required in Mr. Sullivan's plan, he did grant an easement over a different portion of his remaining property to access the Property for pedestrian and bicycle traffic.

deduction from the value of the Property for the cost of such an acquisition.[11]

Rather than delve into a separate valuation of a hypothetical access easement upon which no evidence was presented, we will value the Property based on what was actually transferred. Mr. Sullivan testified that although the layout of the subdivision would have to be adjusted if access was not available, the total number of lots on his plan would not necessarily change. After examining the Sullivan plan, we find that by extending an existing road (as drawn on the plan) and connecting it to the opposite end of the road requiring the access easement, the need for access over petitioner's remaining property would be eliminated. This change will allow access to the lots in this section of the Property and result in a loss of, at most, two lots on the Sullivan plan. Therefore, we find that the Property could be subdivided into at least 112 house lots.

Price Per Lot

The experts in this case each employed a different method in estimating the price that each of these subdivided lots would sell for. Mr. Avery divided the Property into five different categories based on location and other amenities, such as view. Utilizing comparable sales data for lots sold in the area, and

[11]Respondent made no effort to value such an access easement.

adjusting for differences between the lots on the Property and those of the comparables, Mr. Avery assigned a value to each of his lot categories.[12] Petitioner's experts, however, did not categorize the Property in the same manner. Mr. Segel and Mr. Handverger both used an average price for all of the lots, estimating that the lots would sell for $200,000 on the average. Their estimates are based on comparable sales data, which utilized lot sales from various subdivisions in Framingham, Southborough, and Marlborough and relied primarily on sales data from Framingham. Mr. Dallamora, on the other hand, categorized the lots based upon their location. Relying on his real estate sales experience in the area, Mr. Dallamora estimated that the sale price of lots in Framingham and Southborough would be $175,000, and the price of lots in Marlborough would be $150,000.

Respondent contends that petitioner's use of an average price per lot does not account for the differing attributes of the various lots and, thus, Mr. Avery's categorization method yields a more accurate estimate of value. However, due to the large number of lots, even Mr. Avery's five categories could not

[12]These are the lot categories and prices Mr. Avery estimated for the Property:

| | |
|---|---|
| Standard Marlborough (17) | $150,000 |
| Standard Framingham (60) | 165,000 |
| Marlborough pond (9) | 165,000 |
| Framingham pond (15) | 181,500 |
| Framingham oversize lots (6) | 250,000 |

possibly reflect the various attributes of each of the 112 lots. Therefore, for purposes of this valuation, we determine that the use of an average estimate for the price per lot is appropriate. Further, we do not assume that every lot would sell for this average price, but rather that the lots would sell for a range of prices and the use of an average selling price within that range is appropriate for valuing the Property as a whole.

Using Mr. Avery's lot price estimates, the average selling price of a developed lot on the Property would be $169,696.[13]  Mr. Dallamora's estimates produced an average lot price of $168,859 for the entire Property.[14]  Messrs. Segel and Handverger both estimated that the average price per lot would be $200,000. Based on the comparable sales data submitted for individual lots,

---

[13]Calculation of Mr. Avery's average lot sale price:

| | | | |
|---|---|---|---|
| Standard Marlborough | (17)x | $150,000 = | $2,550,000 |
| Standard Framingham | (60)x | 165,000 = | 9,900,000 |
| Marlborough pond | (9)x | 165,000 = | 1,485,000 |
| Framingham pond | (15)x | 181,500 = | 2,722,500 |
| Framingham oversize lots | (6)x | 250,000 = | 1,500,000 |
| | 107 | | $18,157,500 |

$18,157,500 ÷ 107 = $169,696.26

[14]Calculation of Mr. Dallamora's average lot sale price:

| | | | |
|---|---|---|---|
| Framingham | (84)x | $175,000 = | $14,700,000 |
| Marlborough | (28)x | 150,000 = | 4,200,000 |
| Southborough | ( 2)x | 175,000 = | 350,000 |
| | 114 | | $19,250,000 |

$19,250,000 ÷ 114 = $168,859.65

the expert reports, and Mr. Dallamora's extensive experience in real estate sales, we conclude that the individual developed lots would sell for an average price of $170,000.

Time Required To Sell the Lots

The length of time required to sell all the lots on the Property is a factor of both market conditions and the amount of time required to receive the necessary approval of the development permits from the various municipalities.  Both petitioner and respondent estimated that this approval process for the development of the Property would take 6 months to 1 year.  However, the parties disagree as to when this period of time would begin to run.  Mr. Handverger testified that the approval period would have begun during the purchase and sale agreement phase, which was prior to the final purchase date. Petitioner's experts reason that a typical buyer for a parcel of land, such as the Property here, would conduct the approval process during this time, or, in the alternative, the buyer would enter into an agreement, whereby the purchase of the Property would be subject to the required approval process.  Respondent's expert Mr. Avery, on the other hand, used a 1-year period in his valuation, which began on the actual transfer date of the Property to the Commonwealth.

The application of any valuation method involves the use of certain hypotheticals.  In the SDM, the property is developed

into a hypothetical residential subdivision in order to determine what an informed buyer would pay for the parcel of land. It is thus reasonable to consider what a hypothetical buyer would have done under these circumstances. In the present case, the Commonwealth entered into an "Option to Buy" agreement with petitioner for the Property on May 27, 1986, approximately 5 months before the closing date. Therefore, we will assume that a hypothetical buyer would have begun the approval process on this date, leaving an approval period of, at most, 7 months following the transfer date.

The evidence further demonstrates that the Property would be developed and sold in phases over a period of years. A hypothetical buyer would not have to build all the roads and obtain all the permits for the entire subdivision before selling the first lot. Rather, the buyer could develop and sell the lots in stages, obtaining approval for portions of the development at appropriate times and then selling the approved lots to builders, thereby eliminating any delay for the approval process. We do not deem it necessary, therefore, to factor any additional time for the approval of the necessary permits into our determination.

The other element of the selling period involves the length of time it takes for the developed lots to be absorbed by the existing market. Mr. Handverger estimated that the absorption rate for this Property would be anywhere from 3-5 years. Messrs. Segel and Dallamora estimated that 2 years would be sufficient to

sell the developed property given the desirability of the area and the market conditions existing at that time. Furthermore, Mr. Dallamora believed that it would be relatively easy to sell the lots in bulk to home builders, rather than to individual home buyers. Mr. Avery, however, believed that the market in the area was shallow for high-priced homes at the time of transfer and, thus, estimated a 5-year absorption period.

In light of all the evidence presented, we consider Mr. Avery's appraisal unduly pessimistic with respect to the absorption period. Given the booming real estate market and the premium location of the Property, and assuming bulk sales of the lots to builders, we find a 3-year absorption period more realistic.

Development Costs

A. Sewer Improvements

The parties differ significantly over the estimated expense of the sewer system necessary for the development of the Property. The experts all agreed that the lots in Marlborough would be serviced by septic systems on the individual lots, while the Framingham and Southborough lots would be tied into the Framingham sewer system. Exactly how this would be accomplished is the subject of dispute.

Petitioner contends that the lots in Framingham and Southborough could be connected to the Framingham sewer system via the 8-inch sewer line installed by Eastleigh Development near the Property line at Edmands Road. In order to handle the additional sewage, Mr. Dallamora anticipated that the only expense would involve the upgrading of the Angelica pumping station at a cost of approximately $30,000 to $40,000. These are the sole considerations, with respect to sewer improvements, found in petitioner's valuation of the Property.[15]

However, Mr. Flint stated that, based on information obtained from Benjamin B. Bugbee of Haley and Ward, Inc., sewer consultants to the town of Framingham, and Robert Angelo, Framingham's sewer superintendent, there was not sufficient capacity in October 1986 to tie the subdivision into the Framingham sewer system at the Edmands Road location, and significant improvements would have had to be made. These improvements would have involved the installation of a pump/lift station on the subdivision in order to move waste materials from the subdivision into the system. Furthermore, a forced main sewer line would have had to be extended 10,200 feet eastward from the location of the Property. The total cost for the

[15]In valuing the Property, petitioner's experts all assumed that the Property could be connected to the Framingham sewer system at the Edmands Road location.

construction of both these sewer system improvements would be $820,000.

In light of the conflicting evidence presented regarding this factor, we conclude that a prudent investor would consider the uncertainty of this expense and include the potential cost of extending and upgrading the sewer system into any valuation of the Property. Therefore, we determine that $820,000 must be allocated to the construction of the sewer system for the Property.

## B. Road Costs

Mr. Dallamora presented the most persuasive evidence on road costs. In his valuation, Mr. Dallamora contacted two local contractors, James E. Hanscom[16] and Paul J. Fantoni,[17] and requested bids on the anticipated road construction costs. Messrs. Hanscom and Fantoni have extensive experience in the construction of roadways in the area. Based upon the bids received from these contractors, Mr. Dallamora estimated that the

---

[16]Mr. Hanscom was the director of Public Works for the town of Framingham from 1980 to 1990 and has over 30 years of roadway and site construction experience.

[17]Mr. Fantoni was the owner of Fantoni Co., a construction company specializing in the construction of underground utilities and bridge building for over 25 years. Mr. Fantoni holds a bachelor of science degree in civil engineering.

cost to build the roads in the subdivision would total $2,123,788.[18]

Mr. Dallamora's road construction expense also included $150,000 for the removal of ledge, an expense item separately stated in Mr. Avery's report.[19] Relying upon Mr. Flint's analysis of the composition of the soil on the Property, Mr. Avery estimated that a separate expense of $370,000 should have been allocated for the removal of ledge.[20] We find Mr. Avery's estimate concerning this additional construction cost persuasive; thus, Mr. Dallamora's estimate for ledge removal must be increased to reflect this expense properly. Based upon all the evidence presented, we conclude that the cost to build the roads on the Property, including the cost of removing ledge, would total $2,350,000.[21]

---

[18]Mr. Handverger estimated that road construction would cost $2,200,000. Similarly, Mr. Segel estimated that the expense would total $2,140,000.

[19]Mr. Avery stated that "Ledge is the 'enemy' of a site developer as it adds to development cost and makes road and building placement more challenging."

[20]Mr. Avery's road construction estimate without the ledge removal expense was $2,569,842.

[21]We calculate the road cost as follows:

> Mr. Dallamora's estimate ($2,123,788), plus an additional amount for ledge removal ($370,000 - 150,000 = 220,000) = 2,343,788 or $2,350,000.

We further determine that this amount would be incurred in two phases, 80 percent in the first phase and the remaining 20

(continued...)

Special Use Permit

In conjunction with the transfer of the Property, petitioner received a Special Use Permit from the Commonwealth that allowed him to continue to grow and harvest hay on a 22.5-acre portion of the Property.  As a result, respondent contends that the fair market value of the Property should be diminished by the value of the Special Use Permit in order to reflect accurately the value of what was transferred.  Rather than present evidence that would demonstrate the value of the Special Use Permit, respondent appears to argue that the value of the Special Use Permit is the difference between the value of the Property and the cash received from the Commonwealth.  For instance, even though respondent's own expert increased his valuation of the Property from $7.5 million to $8.3 million, respondent still does not concede that petitioner is entitled to any charitable deduction.

The evidence presented by petitioner, however, suggests that the Special Use Permit had little or no value.  Indeed, petitioner testified that it cost him more to grow and harvest the hay on this land than the hay was actually worth.  In addition, the Commonwealth had the power to terminate the Special Use Permit at any time and for any reason.  We find that the

---

[21](...continued)
percent in the second phase.

Special Use Permit will have no effect on the valuation of the Property.

Based upon an analysis of all the valuation evidence introduced through both testimony and documentation, and giving due consideration to the credibility of the witnesses at trial, we determine that the fair market value of the Property at the time of the contribution was $10,970,000.[22]

## Additions to Tax, Penalties, and Interest

### Sections 6653(a) and 6662 Additions and Penalty for Negligence or Intentional Disregard of Rules and Regulations

Respondent also determined that petitioner was liable for additions to tax and a penalty for negligence or intentional disregard of rules or regulations (1) under section 6653(a), equal to 5 percent of the respective underpayments for 1987 and 1988, and (2) under section 6662, equal to 20 percent of a portion of the underpayment for 1989. Respondent determined that the 20-percent addition under section 6662 should apply with respect to the entire underpayment for 1989. Respondent further determined that petitioner was liable for an addition to tax

---

[22]Our determination is also supported by the previous offer made by Eastleigh Development to purchase the Property for $10 million plus 20 percent of the profit from the development of the Property.

See the appendix for calculation of our valuation determination.

under section 6653(a)(1)(B) for 1987. Under section 6653(a)(1)(B), an addition to tax (equal to 50 percent of the interest payable under section 6601) is imposed with respect to the portion of the underpayment attributable to negligence. Respondent determined that the entire 1987 underpayment resulting from petitioner's improper deduction was attributable to negligence on petitioner's part.

Negligence has been defined as the failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Respondent's determinations are presumed correct, and petitioner bears the burden of proving otherwise. Rule 142(a); Luman v. Commissioner, 79 T.C. 846, 860-861 (1982). However, reasonable reliance upon expert opinion, asserted in good faith, can shield a taxpayer from section 6653(a) additions. United States v. Boyle, 469 U.S. 241, 250 (1985); Collins v. Commissioner, 857 F.2d 1383, 1386 (9th Cir. 1988), affg. T.C. Memo. 1987-217.

We find that petitioner reasonably relied upon the expert opinion of Mr. Handverger when claiming the charitable deduction in issue, and, therefore, he is not liable for additions or an accuracy-related penalty. Mr. Handverger was and remains a licensed real estate appraiser in the Commonwealth. His valuation report on the Property is detailed and complete. In addition, petitioner previously received a bona fide offer to purchase the Property for $10 million plus 20 percent of the

development profits. This offer is reasonably close to Mr. Handverger's appraisal of the Property and the figure used by petitioner on his 1986 income tax return.

Section 6659 Valuation Overstatement Addition to Tax

Respondent also determined that petitioner was liable for a section 6659 addition to tax for a valuation overstatement. A valuation overstatement exists if the value of any property or the adjusted basis of any property claimed on a return exceeds 150 percent of the amount determined to be the correct amount. Sec. 6659(c). With respect to charitable deduction property, the amount of the addition to tax is equal to 30 percent of the underpayment. Sec. 6659(f)(1). On his return, petitioner claimed that the fair market value of the property was $12 million. We have determined that the property's fair market value was actually $10,970,000. Therefore, petitioner did not overstate the fair market value of the property by 150 percent ($10,970,000 x 150% = $16,455,000), and he is not liable for the overvaluation addition to tax.

Increased Interest

Respondent also determined that petitioner was liable for additional interest pursuant to section 6621(c). Section 6621(c) provides for an interest rate of 120 percent of the adjusted rate established under section 6621(b) if there is a "substantial

underpayment" (an underpayment in excess of $1,000) in a taxable year "attributable to 1 or more tax motivated transactions". Respondent argues that petitioner's deduction was a tax-motivated transaction because it involved a valuation overstatement within the meaning of section 6659(c). Sec. 6621(c)(3)(A)(i). Because we do not find any valuation overstatement within the meaning of section 6659(c), the increased interest under section 6621(c) does not apply.

<u>Decision will be entered under Rule 155</u>.

# APPENDIX

|  | Estimated Retail Price | Period 1 | Period 2 | Period 3 | Totals |
|---|---|---|---|---|---|
| **INCOME** | | | | | |
| Number of lots sold | $170,000.00 | 38 | 37 | 37 | 112 |
| *Gross proceeds from lot sales* | Appreciation rate=12% | $6,460,000.00 | $7,044,800.00 | $7,890,176.00 | $21,394,976.00 |
| | | | | | |
| **EXPENSES** | | | | | |
| Cost to complete roads | 2,350,000.00 | 1,880,000.00 | 470,000.00 | | 2,350,000.00 |
| Sewer lift/pump station cost | 820,000.00 | 820,000.00 | | | 820,000.00 |
| Real estate taxes (per lot) | 500.00 | 56,000.00 | 37,000.00 | 18,500.00 | 111,500.00 |
| Legal expenses/closing costs (per lot) | 700.00 | 26,600.00 | 25,900.00 | 25,900.00 | 78,400.00 |
| Engineering (per lot) | 1,500.00 | 57,000.00 | 55,500.00 | 55,500.00 | 168,000.00 |
| Marketing | 5.00% | 323,000.00 | 352,240.00 | 394,508.80 | 1,069,748.80 |
| *Total expenses* | | 3,162,600.00 | 940,640.00 | 494,408.80 | 4,597,648.80 |
| | | | | | |
| Development proceeds | | 3,297,400.00 | 6,104,160.00 | 7,395,767.20 | 16,797,327.20 |
| Developer's overhead and profit | 15.00% | 969,000.00 | 1,056,720.00 | 1,183,526.40 | 3,209,246.40 |
| Net development proceeds | | 2,328,400.00 | 5,047,440.00 | 6,212,240.80 | 13,588,080.80 |
| | | | | | |
| Present worth of net proceeds | 11.00% | 2,328,400.00 | 4,096,613.35 | 4,542,334.56 | 10,967,347.91 |
| | | | | | |
| **Rounded total** | **$10,970,000.00** | | | | |

Note:  In Period 1 no adjustments are made for appreciation or discount value; these two factors nearly cancel each other out, and it is difficult to determine precisely when in this period sales would occur or income would be received.