T.C. Memo. 1997-571

UNITED STATES TAX COURT

RESTORE, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 8508-96.                    Filed December 29, 1997.

Glen A. Stankee, for petitioner.

Sergio Garcia-Pages, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

RUWE, Judge:  Respondent determined deficiencies in
petitioner's Federal income taxes and accuracy-related penalties
as follows:

|  | | Accuracy-related Penalty |
| Year | Deficiency | Sec. 6662(a) |
| 1991 | $81,451 | $16,290 |
| 1992 | 714,424 | 142,885 |
| 1993 | 477,936 | 95,587 |

After concessions, the issues for decision are: (1) Whether petitioner may accrue and deduct royalties computed but not yet paid under an agreement with Matrix, a foreign corporation which owns 70 percent of petitioner; (2) whether petitioner may deduct interest accruals allegedly owed to Matrix on the unpaid royalties; and (3) whether petitioner is liable for accuracy-related penalties pursuant to section 6662(a).[1]

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the second stipulation of facts are incorporated herein by this reference.

Petitioner, a Florida corporation with its principal office in Fort Lauderdale, filed its Form 1120, U.S. Corporation Income Tax Return, on a calendar year basis. Petitioner reported its income and kept its books using the accrual method of accounting for each year in issue. Petitioner's principal product is named "Restore", an automobile engine additive sold in many stores throughout the United States, Canada, and the Caribbean. The essential ingredient in the engine additive is a specially developed metal alloy (alloy) in powdered form which, when mixed

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

with oil and added to the crankcase of an operating engine, is supposed to increase engine compression, power, and efficiency in older cars. The alloy is manufactured and added to the oil, and transferred to petitioner through a group of related entities with which petitioner is affiliated.

The formula and process by which the alloy is manufactured was developed by a member of the Sultan family. Mr. Omar Sultan, a U.S. citizen and a member of the Sultan family, sought to market the alloy. In 1982, purely by chance, Mr. Sultan met Mr. Ramzi Toufic Fares on a train in Germany where the two men discussed the uses of the alloy. Mr. Fares had experience in project development, investment banking, management, and raising investment capital. As a result of the chance meeting, Mr. Sultan and Mr. Fares developed a plan whereby they would form a group of corporations through which they would market the alloy.

In furtherance of their common goal, Mr. Fares and Mr. Sultan caused the formation of Matrix Metal Corp. (Matrix) under the laws of the Republic of Panama on January 13, 1983. Under its articles of incorporation, Matrix had authorized capital of $5 million divided into 5,000 shares with a par value of $1,000 per share. The first directors of Matrix were listed as Mr. Fares, Mr. Sultan and Dr. Samir Klat, and the first officers were Mr. Fares (president and treasurer) and Mr. Sultan (secretary). The principal activity of Matrix was to act as a holding company

for subsidiary companies involved in the production, conditioning, and marketing of the alloy.

On February 11, 1983, Matrix entered into an agreement known as the "Heads of Agreement" with Mr. Edwin J. Werner, Mr. Richard Rynkiewicz, and Mr. John C. Davidson, Jr., who became shareholders in an S corporation known as WRD, Inc.[2]  The Heads of Agreement contained, among other things, a provision that required Matrix and WRD, Inc., jointly to form a company named "Restore Corporation" (later known as petitioner).  Petitioner's main purpose was to market Matrix's products in North America and the Caribbean.  Paragraph 6 of the Heads of Agreement required that petitioner would be owned 70 percent by Matrix and 30 percent by the partners of WRD, Inc.  Paragraph 12 of the Heads of Agreement states that "RESTORE shall pay MATRIX a royalty fee equivalent to 10 (ten) percent of RESTORE'S net sales, in return for the exclusive rights granted by MATRIX to RESTORE."

On February 23, 1983, articles of incorporation for petitioner (Restore Incorporated) were filed with the State of Florida.  The articles of incorporation listed the following officers and directors of petitioner:  Mr. Werner (president), Mr. Rynkiewicz (secretary/treasurer), Mr. Davidson (vice

---

[2]At the time of the execution of the Heads of Agreement in 1983, Messrs. Werner, Rynkiewicz, and Davidson were in the process of forming an S corporation with Mr. Ronald C. Dugan and Mr. Joe Quinlan known as WRD, Inc.  However, in the Heads of Agreement, WRD, Inc., was referred to as "the Corporation."  WRD, Inc., was organized under the laws of the State of Florida.

president), Mr. Fares (vice president), and Mr. Sultan (vice president).

On February 24, 1983, petitioner's first meeting of the board of directors was held and the following persons were elected as officers: Mr. Werner (president); Messrs. Davidson, Fares, and Sultan (vice presidents); and Mr. Rynkiewicz (secretary and treasurer). Each of the above-listed persons was also elected as a director of petitioner. Petitioner's shares of common stock were issued to Matrix and WRD, Inc. Fourteen shares (70 percent) were issued to Matrix and six shares (30 percent) were issued to WRD, Inc.

On March 16, 1983, Matrix and WRD, Inc., entered into a second agreement, which superseded and replaced the Heads of Agreement and was known as the "Joint Venture Agreement" (JV agreement). The JV agreement contained provisions similar to those contained in the February 11, 1983, Heads of Agreement. The JV agreement provided, among other things, that Matrix and WRD, Inc., would jointly form a corporation named Restore Incorporated (petitioner). Petitioner's primary purpose was to market the products of Matrix "according to terms and conditions to be set out in an agreement between MMC and RESTORE (hereinafter referred to as the "Marketing Agreement")."[3] Again,

---

[3]Under the JV agreement, Matrix Metal Corporation is referred to as "MMC". By Mar. 16, 1983, petitioner was already formed as a corporation under the laws of Florida. Petitioner
(continued...)

the parties agreed that Matrix would own 70 percent of petitioner and WRD, Inc., would own 30 percent of petitioner. Paragraph 11 of the JV agreement states "RESTORE shall pay MMC a royalty fee equivalent to 10 (ten) percent of RESTORE's net sales, in return for the exclusive rights to be granted by MMC to RESTORE as set forth in the Marketing Agreement. Net sales shall be defined as total gross sales less returns." The JV agreement provided that Mr. Sultan shall be the chairman of the board and Mr. Werner shall be the president and the chief executive officer of petitioner. The agreement was signed by Mr. Fares as the president of Matrix and by Mr. Werner as president of WRD, Inc.

On April 5, 1983, Matrix entered into an agreement with petitioner known as the "Marketing Agreement". Among other things, the Marketing agreement provided that petitioner, as Matrix's exclusive representative in North America and the Caribbean, would market and sell Matrix's product consisting primarily of the alloy in its finished form. Paragraph 6 of the Marketing agreement provided:

> In return for the exclusivity granted by MMC [Matrix]
> to RESTORE under the provisions of this Agreement,
> RESTORE shall pay MMC a royalty fee of 10 (ten) percent
> of RESTORE's net sales. Net sales shall be defined as
> total billed gross sales less the value of any products
> returned by customers and less the trade cash discount
> of 2%.

---

[3](...continued)
continued to file its Federal income tax returns as a U.S.
corporation.

Paragraph 18 of the Marketing agreement stated:

> This Agreement shall be initially valid for a period of 5 (five years) from the date of its signing by the last of the two Parties.  Unless terminated in accordance with the provision of paragraph 19 (nineteen) below, it shall be automatically renewed thereafter on a year by year basis.[4]

The Marketing agreement was signed by Mr. Fares as president of Matrix and by Mr. Werner as president of petitioner.

At the time the Marketing agreement was signed, petitioner began incurring expenses, building inventory, and accruing receivables.  Petitioner also began accruing royalties owed to Matrix under the terms of the Marketing agreement.  Petitioner, however, has never paid any of the accrued royalties to Matrix.

Prior to Matrix's first shareholders' meeting in April of 1984, Matrix estimated that by August of 1985 petitioner would have positive cash-flow.  Also, the shareholders of Matrix agreed that although Matrix expected to accrue over $2 million in royalties from petitioner by August 1985, Matrix would cause the royalties to be retained by petitioner until petitioner's cash-

---

[4]Paragraph 19 states:

> This Agreement may be terminated by either Party at any time during its validity in case of breach of any of its provisions by the other Party and failure to correct the breach within 30 (thirty) days from notification to that effect by the complaining Party to the breaching Party.

flow became positive or until its financial performance allowed it to obtain credit at agreeable terms from a U.S. financial institution.  On December 17, 1984, Mr. Fares and Mr. Werner signed a document entitled "Addendum No. 1" (addendum) to the Marketing agreement.  The addendum adds to paragraph 6 of the Marketing agreement and states in part:

1. Royalty fees accruing since inception, until 31st December, 1984, will be payable on the 31st January, 1985.

2. As of 1st January, 1985, royalty fees will be payable based on the net sales realised [sic] each quarter, and will become due one month after the end of each quarter, the first time on 30th April, 1985, on the basis of the first quarter's sales.

3. In consideration of the financial situation and the cash position of RESTORE INC., the parties may agree on postponement of payment to a mutually agreeable later date.  However, in such circumstances, the amounts due will bear interest from the due date, until the time of payment, at the rate of 2% p.a. (two percent per annum) over the U.S. prime rate.  The applicable rate will be the rate published on the first banking day of each quarter, with validity for the full quarter.

This addendum forms an integral part of the above [Marketing] Agreement.

The addendum was signed by Mr. Fares as president of Matrix and by Mr. Werner as president of petitioner.  For the tax year ending December 31, 1985, petitioner accrued, expensed on its books, and deducted for tax purposes, interest payable to Matrix on the accrued royalties at an interest rate of prime plus two percent. Petitioner never paid Matrix the accrued interest.  As a

result of the accrual of interest payable by petitioner, Matrix recorded interest receivable from petitioner and a corresponding amount of income.

Beginning in 1983, petitioner reported a net loss on its Form 1120, and continued to report losses until the year ending December 31, 1988. In the years ending December 31, 1989 and 1992, petitioner reported positive taxable income before taking a deduction for net operating losses from prior years. In 1990, 1991, and 1993 through 1995, petitioner reported net losses. Petitioner reported no tax due and paid no taxes in all the years 1983 through 1995. Petitioner's accrued royalties and interest due on the accrued royalties to Matrix as of December 31, 1994, were $6,186,961 and $1,417,697, respectively. Throughout this time period, petitioner continued to accrue, deduct, but not pay, royalties and interest related to the accrued royalties.

OPINION

The first issue we must decide is whether petitioner may accrue and deduct royalties computed but not yet paid under an agreement with Matrix. Respondent argues that petitioner is not entitled to deduct the accrued royalties at issue because petitioner's liability to pay the accrued royalties was subject to the contingency that profits must first be realized before petitioner was to pay the accruals. Petitioner's position is that it may deduct the accrued royalties because the liability to

pay the accrued royalties was established during each year in which they were accrued and only the time of payment was contingent.

The standard for determining whether an accrual basis taxpayer has incurred a deductible expense for Federal income tax purposes is governed by the "all events test."  See United States v. General Dynamics Corp., 481 U.S. 239, 242 (1987); United States v. Hughes Properties, Inc., 476 U.S. 593, 600-601 (1986); Putoma Corp. v. Commissioner, 601 F.2d 734, 738 (5th Cir. 1979), affg. 66 T.C. 652 (1976).  Under the Regulations, the "all events" test has two elements, each of which must be satisfied before accrual of an expense is proper.  First, all the events which establish the fact of the liability must have occurred.  Second, the amount must be capable of being determined "with reasonable accuracy."  United States v. Hughes Properties, Inc., supra at 600; sec. 1.446-1(c)(1)(ii), Income Tax Regs.[5]

---

[5]In the Deficit Reduction Act of 1984, Congress incorporated the "all events" test into the Internal Revenue Code by adding a new sec. 461(h). Pub. L. 98-369, sec. 91(a), 98 Stat. 598, 607. Sec. 461(h)(4) provides that the "all events test" is met "with respect to any item if all events have occurred which determine the fact of liability and the amount of such liability can be determined with reasonable accuracy."  Sec. 461(h)(1) limits the applicability of the test by providing that it is not met until "economic performance" occurs.  See United States v. General Dynamics Corp., 481 U.S. 239, 243 n.3 (1987).  In light of our conclusion, infra, that petitioner has failed to satisfy the "all events" test, we need not consider the applicability of the economic performance requirement.

With respect to the first requirement of the all events test, the accrual of an item of expense is improper where the liability for such item is contingent upon the occurrence of a future event.[6]  See Security Flour Mills Co. v. Commissioner, 321 U.S. 281 (1944); Brown v. Helvering, 291 U.S. 193, 200 (1934) (except as otherwise specifically provided by statute, a liability does not accrue as long as it remains contingent); Putoma Corp. v. Commissioner, supra at 739.

Paragraph 6 of the Marketing agreement requires petitioner to "pay MMC a royalty fee of 10 (ten) percent of RESTORE's net sales."  The agreement between petitioner and Matrix, as written, does not reveal any contingency upon which the parties appear to have conditioned petitioner's liability.  However, respondent argues that it was Matrix's and petitioner's intention that the payment of the royalties be contingent on reaching an unspecified level of profits.

On April 12 and 13, 1984, the shareholders of Matrix had their first annual meeting.  The report of the shareholder meeting states:

> Although until that date [August 1985] MMC is
> expected to have earned over U.S. $2 million from
> RESTORE INC. in royalties, we have agreed to
> retain such royalties within RESTORE as

---

[6]Respondent does not contend that the accrued royalties could not be determined with reasonable accuracy.  Moreover, the amounts accrued are ascertainable by the formula agreed to in the Marketing agreement.

> shareholders' subordinated loans <u>until such time</u>
> <u>when RESTORE's cash flow will become positive, or</u>
> <u>its market and financial performance will have</u>
> <u>enabled it to negotiate easier terms from the</u>
> <u>same, or another bank in the U.S.A.</u>  [Emphasis
> added.]

Witnesses presented at trial by both petitioner and respondent confirmed that the parties intended that petitioner never actually pay the royalty to Matrix until petitioner's financial performance reached an unspecified level.[7]  Mr. Werner, petitioner's president, testified that from the beginning, when the agreement was first signed, the likelihood of petitioner's making any significant profit was remote and that petitioner would pay the royalties to Matrix as soon as the company began developing a profit.  Mr. Dugan, who succeeded Mr. Werner as petitioner's president, testified it was his understanding that petitioner would not pay the accrued royalties until it began to show a profit.  Mr. Fares, who along with Mr. Sultan founded petitioner, testified that the royalties would only be paid to Matrix when petitioner was profitable and that it was envisioned from the beginning that petitioner would not be profitable for a number of years.  As of the date of trial, petitioner had not made any royalty payments to Matrix.

---

[7]Although Mr. Sultan, a director, officer, and shareholder of Matrix, testified there was no specific agreement that petitioner did not have to pay royalties until it achieved certain goals, we find that in fact there was such an intention in the Marketing agreement.

It is unclear from the record how many contingencies needed to be satisfied before petitioner was required to pay the accrued royalties to Matrix.  According to the report of the shareholders meeting, petitioner had to have either positive cash-flow or financial performance which would enable it to obtain financing from a U.S. bank before the payments were to be made.  Added to these contingencies is a third and fourth contingency that petitioner be sufficiently profitable and have sufficient working capital to meet other financial obligations.  Petitioner does not dispute that payment of the royalties was contingent upon:  (1) Achieving goals set for petitioner, and (2) obtaining sufficient working capital and whatever cash reserves it needed to meet other financial obligations.[8]  We find that the nonpayment of the royalties, which have accrued since 1983, the testimony of all parties involved, and the minutes of Matrix's shareholder agreement are determinative of the fact that the royalty payments were contingent from the inception of the Marketing agreement.

In order to find that there is a contingency such that "all the events" creating the liability have not occurred in the

---

[8]Respondent, in a request for confirmation of answers to questions posed to petitioner in a discovery conference, asked petitioner to confirm, among other things, the following question:  "What criteria would Omar Sultan use to decide when Restore, Inc. should start paying the royalties to Matrix?"  Petitioner answered by stating:  "The royalties would be paid when the goals of the joint venture were achieved, provided it had sufficient working capital and whatever cash reserves it would require to meet its obligations."

taxable year, there must be a contingency as to the _fact_ of the liability itself.  See <u>United States v. Hughes Properties, Inc.</u>, <u>supra</u> at 601-603 (payment not contingent where the fact of the liability was fixed by State law); <u>Mooney Aircraft, Inc. v. United States</u>, 420 F.2d 400, 406 (5th Cir. 1969).  A contingency related only to the timing of the required payment will not prevent a taxpayer from satisfying the all events test.  <u>United States v. Hughes Properties</u>, <u>supra</u> at 604.  Therefore, we must decide whether the contingencies that had to be met in this case concern whether petitioner would ever be liable to pay the royalties and interest.

Petitioner argues that its obligation to pay the accrued royalties was fixed and definite.  Respondent cites two cases which support the disallowance of accruals where the underlying liability is contingent on the taxpayer's profitability or cash reserves.  Respondent cites <u>Putoma Corp. v. Commissioner</u>, 601 F.2d at 739, wherein two corporate accrual taxpayers were not entitled to deductions for accrued bonuses where payment was conditioned under the terms of the agreement on the "judgment of the majority of the directors of the company, [that] the company has sufficient cash reserve in order to pay the salary." Respondent also cites <u>Burlington-Rock Island R.R. v. United States</u>, 321 F.2d 817, 818 (1963), wherein deductions were disallowed for interest accrued under an agreement conditionally obligating the taxpayer to make interest payments "from time to

time, insofar as its cash situation will reasonably permit."   We agree with respondent and find both cases to be on point.

We find no meaningful distinction between the contingencies in Putoma Corp. v Commissioner, supra, and Burlington-Rock Island R.R. v. United States, supra, and the contingencies that must be satisfied prior to payment of the accrued royalties.  There is no guarantee that petitioner will ever have sufficient working capital and cash reserves to meet its obligations.  There is no guarantee that petitioner's profit goals will be met.  Indeed, there is no guarantee that any profit will be made in any particular year or set of years.  The contingency that a certain profit level or that sufficient working capital be reached by petitioner has, as of the end of 1995, not been deemed by petitioner to have been met in any of its operating years.[9]  As of 1995, 13 years after petitioner began accruing royalties owed to Matrix, petitioner has not paid any of the $6 million or more in royalties it has accrued to Matrix.

We find that it was the intent of the parties to the royalty arrangement that the payment of royalties be conditioned upon a

_____

[9]We also note that a 30-percent tax is imposed pursuant to sec. 881(a) on income of foreign corporations not connected with a U.S. business.  Sec. 881(a).  Any payment of royalties by petitioner to Matrix would appear to be subject to the 30-percent tax.  Sec. 881(a); see also sec. 1442(a) (requiring withholding of the tax).  The imposition of the 30-percent tax makes it less likely that petitioner, under the control of Matrix, would ever be required to pay the royalties to Matrix.

contingency which may never be met. Because petitioner, under the control of Matrix, may never be deemed to have met its goals of a certain profit or cash-flow level or may in any given year not be profitable at all, petitioner has taken deductions for expenditures which might never occur. See <u>United States v. Hughes Properties, Inc.</u>, 476 U.S. at 601-603; <u>Putoma Corp. v. Commissioner</u>, 601 F.2d at 739-740; <u>Mooney Aircraft, Inc. v. United States</u>, <u>supra</u> at 406; <u>Burlington-Rock Island R.R. v. United States</u>, <u>supra</u> at 818-820. We hold that the all events test was not satisfied.

The second issue for determination is whether petitioner may deduct interest accruals allegedly owed to its foreign parent on the accrued but unpaid royalties. Petitioner has accrued interest on the royalties payable to Matrix, and we have found that the payment of those royalties is contingent. It follows that the accrued interest may not be regarded as an accrued expense until the years in which the contingency is satisfied and the obligation to pay the royalties becomes fixed and absolute. <u>Burlington-Rock Island R.R. v. United States</u>, <u>supra</u> at 819 (citing <u>Pierce Estates, Inc., v. Commissioner</u>, 195 F.2d 475, 477-478 (3d Cir. 1952), revg. 16 T.C. 1020 (1951)); see also <u>Fox v. Commissioner</u>, 874 F.2d 560, 563 (8th Cir. 1989), affg. T.C. Memo. 1987-209; <u>Putoma Corp. v. Commissioner</u>, 601 F.2d at 740.

Finally, respondent determined that petitioner is liable for accuracy-related penalties under section 6662. Section 6662(a)

imposes a penalty in an amount equal to 20 percent of the underpayment of tax attributable to one or more of the items set forth in section 6662(b). Respondent asserts that the entire underpayment in issue was due to petitioner's negligence or disregard of rules or regulations. Sec. 6662(b)(1).

Negligence has been defined as the failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Respondent's determinations are presumed correct, and petitioner bears the burden of proving otherwise. Rule 142(a); Luman v. Commissioner, 79 T.C. 846, 860-861 (1982). However, reasonable reliance upon expert opinion, asserted in good faith, can shield a taxpayer from penalties for negligence or disregard under section 6662. Glick v. Commissioner, T.C. Memo. 1997-65; see also United States v. Boyle, 469 U.S. 241, 250 (1985); Collins v. Commissioner, 857 F.2d 1383, 1386 (9th Cir. 1988), affg. Dister v. Commissioner, T.C. Memo. 1987-217.

The operative facts that control the propriety of petitioner's accruals present a reasonably close case. Petitioner had certified public accountants prepare its returns for each of the years in issue. They advised that the royalty and interest accruals be taken as deductions on the tax returns for the years in issue. We find that petitioner reasonably relied upon the opinion of its accountants when claiming the

deductions in issue.  We hold petitioner is not liable for the accuracy-related penalties.

Decision will be entered under Rule 155.