T.C. Memo. 2009-290

UNITED STATES TAX COURT

CONSOLIDATED INVESTORS GROUP, STEVEN G. LUCA,
TAX MATTERS PARTNER, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 23703-06.                    Filed December 16, 2009.

Richard D. Panza and Robert P. Ellis, for petitioner.

John M. Tkacik, Jr., for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, Judge:  Consolidated Investors Group (the partnership) claimed a $641,000 charitable contribution deduction on its 2003 Form 1065, U.S. Return of Partnership Income, resulting from an alleged bargain sale.  Respondent disallowed the charitable contribution deduction because the partnership

allegedly failed to substantiate its entitlement to a charitable contribution deduction, and the alleged bargain sale did not satisfy the statutory requirements.  In the alternative respondent asserts that if the partnership is entitled to a charitable contribution deduction related to the bargain sale, the partnership's apportionment of the adjusted basis of the property between the sale portion and the contribution portion must be adjusted.  We conclude the partnership made a bargain sale of the property for the amount it reported.  We also conclude that an adjustment should be made to the allocation of the adjusted basis between the sale portion and the charitable contribution portion of the property.

The Partnership

The partnership is an Ohio general partnership located in Lorain County, Ohio.  It consists of approximately 20 partners and holds land for future development or investment purposes. Most of the partnership's investors are from Lorain County. Steven Luca is the tax matters partner for the partnership.[1]

In 1979 the partnership purchased approximately 250 acres of property consisting of two adjacent parcels along State Route 58 in Lorain County for investment purposes.  Approximately 850 feet

---

[1]  Mr. Luca negotiated on behalf of the partnership with the Ohio Turnpike Commission before the partnership hired an attorney.

of the larger parcel of the property directly abutted State Route 58.

At the time the partnership purchased it, the property was zoned residential/agricultural.  In 1980 the partnership petitioned for a change in the zoning, to commercial.  The lots on both sides of the property were already zoned commercial.  Forty acres of the property (including some which abutted State Route 58) were rezoned commercial in July 2001.

Ohio Turnpike Commission

The Ohio Turnpike, a 241-mile-long highway traversing the northern part of the State of Ohio, is a toll road that was constructed in 1953.  Originally the Ohio Turnpike had 17 interchanges;[2] it currently has 31 interchanges.  At the time of trial Joseph Disantis was the right-of-way coordinator for the Ohio Turnpike Commission (OTC), a position he had held since 1986.  In that capacity he bought property for the construction of interchanges along the Ohio Turnpike.

The OTC began studying the possibility of building an interchange at State Route 58 in the late seventies and early eighties.  Among the purposes for constructing an interchange are, first, to encourage economic development in the area of the

---

[2]  The interchange gives vehicles an opportunity to enter or exit the turnpike.

interchange, and second, to generate toll revenues (through ingress onto and egress from the turnpike).

On March 8, 1993, the OTC adopted Resolution No. 11-1993 titled "Resolution Approving the Location, Design and Acquisition of Right-of-Way for an Interchange with State Route 58 and the Ohio Turnpike in the Vicinity of Milepost 140.2 in Lorain County, Ohio" (State Route 58 resolution). The State Route 58 resolution approved the location, design, and acquisition of a right-of-way for an interchange at State Route 58 (State Route 58 interchange). Once the OTC adopted the State Route 58 resolution, it began the design phase of the project. For various reasons (sewer building, presence of wetlands, and a scenic railway corridor), the State Route 58 interchange was postponed until 2001.

I. Correspondence Between the Partnership and the OTC in Respect of Acquiring the Property

The first written correspondence with the partnership about the State Route 58 interchange was a letter from the OTC dated April 9, 2001. That letter stated the OTC intended to acquire a right-of-way and purchase real estate (property) from the partnership, and it would pay the partnership $93,800 as fair compensation for the property. The letter did not specify what property was to be acquired and offered compensation as follows:

| Parcel | $93,000 |
| Temporary construction easements | 800 |
| Improvements | N/A |
| Damage | N/A |

There was no compensation provided for damage which might result to the residue of the partnership's property as a result of the taking. In 1999 the OTC had offered the partnership approximately $200,000 for this property; however, the offer was never put in writing. The offer in the April 9, 2001, letter was based on a February 2001 appraisal commissioned by the OTC. In July 2001 approximately 40 acres of the partnership's property were rezoned commercial.

Between 2001 and 2003 representatives of the partnership and the OTC communicated in person and through telephone calls and letters about the possibility of the OTC's acquiring the partnership's property. Mr. Luca was the representative of the partnership and Mr. Disantis was the representative of the OTC in these discussions until an action was filed in court. The communications involved determining the property on which the OTC sought a right-of-way and filing an action to appropriate the property. Both Mr. Luca and Mr. Disantis testified as witnesses.

A. <u>Determining the Location of the Right-of-Way</u>

After a July 5, 2001, telephone call the OTC sent the partnership a description of the property sought by the OTC for the right-of-way for the State Route 58 interchange. In a July

9, 2001, letter the OTC stated it needed 13.187[3] acres of the partnership's parcels (the property).

The partnership responded in a letter dated July 25, 2001. In that letter the partnership complained about the delay in receiving a response from the OTC and about the information the OTC had given local media, and it stated the partnership was embarrassed by the $93,800 offer because it was substantially less than the OTC had offered the partnership in 1999. This letter from the partnership also contained the following statement: "Since 1990 our organization has been a strong advocate of the OTC and its activities. Currently we continue to support your activities with caution."

After a written reminder dated August 17, 2001, by the partnership that it still had not received a response to its July 25, 2001, letter, the OTC responded on August 24, 2001. The OTC did not adjust its offer to reflect the rezoning of 40 acres of the partnership's property. The OTC asked how the partnership could be embarrassed by the offer when the partnership did not have an appraisal as to the fair market value of the property. The OTC refused to meet with the partnership until the

---

[3] We assume this number was subsequently adjusted because all appraisals refer to a taking of approximately 12.4 acres. This disparity and/or subsequent change is without consequence to the outcome.

partnership had provided the OTC with a written appraiser's opinion of the fair market value of the property.

On August 28, 2001, the partnership requested the OTC to provide a copy of its appraisal of the fair market value of the property. The partnership also stated that it would be pleased to obtain a current appraisal of the property once the OTC had made a final decision as to whether the construction of the State Route 58 interchange was going to proceed. The letter stated: "In conclusion, our organization consists of various gentlemen of the community that continue to support the activities of the OTC."

On September 5, 2001, the OTC requested the partnership to either accept or reject its offer of $93,800 within 30 days. This figure was not adjusted to reflect the July 2001 change in zoning of 40 acres of the partnership's property. On September 14, 2001, the partnership said it could not make a decision and asked for specific additional information. The partnership reminded the OTC that it had not received a response as of September 28, 2001. The OTC replied on October 5, 2001, but did not provide the specific additional information requested.

The partnership again asked for the following: Specific additional information about the project, the assistance of the OTC in conveying the property, the parcel numbers and acreage to be purchased by the OTC, the placement of stakes currently in the

property, the documents sent by the OTC to all of the partnership's partners except the tax matters partner, a copy of the OTC appraisal, all working drawings, legal descriptions and surveys of the referenced property, property maps, acreage required to preserve the railroad, water line easements, the acquisition costs to the OTC of the railroad and a bridge over State Route 58, and any information the OTC considered appropriate to assist the partnership in its analysis.

B.  Attempts To Negotiate

Eventually, the OTC provided the partnership with the information it had requested to complete its appraisal report. The partnership contacted the OTC on April 24, 2002, and reported it was ready to proceed in discussions related to the project and the value of the property.  In response the OTC requested a counteroffer and supporting documentation.

The partnership responded that it would be reluctant to present a counteroffer, and it wanted to continue negotiations in person.  The letter stated the partnership's intention to complete the transaction within a 30-day period in a fair and orderly manner for the benefit of all parties concerned and that it was prepared to proceed in good-faith negotiations.

During a telephone call on July 17, 2002, the partnership informed the OTC that its appraisal report on the property suggested a fair market value of approximately $2,900,000

(including damages). The partnership informed the OTC that it would consider all reasonable offers and would consider a contribution/sale of the property to the OTC. In written correspondence dated July 17, 2002, the partnership reminded the OTC that it desired to meet and negotiate with the OTC. The partnership wrote that it would consider a contribution/sale of the defined property to the OTC and stated: "Since approximately 1990, our organization has been a strong advocate of the OTC and its activities." The partnership was willing to accept a minimal amount in cash, as long as the partnership was receiving fair market value for the property in the form of cash and contribution. The partnership wanted to push the project along because it felt the interchange would benefit Lorain County.

In a July 19, 2002, letter the OTC treated this as an initial demand and reminded the partnership of its February 2001 appraisal report determining that the property was worth $93,800. The OTC did not present a different figure for the partnership to consider.

The partnership responded in a letter dated July 22, 2002, that the $2,900,000 appraisal report determination was not a demand, and it would be unable to provide the OTC with a demand for the property until it was able to meet with the OTC. The partnership reminded the OTC that it would consider all reasonable offers and that it would consider a contribution/sale

of the defined property to the OTC.  The letter ended with the following:  "Kindly correct your records.  **NO DEMANDS HAVE BEEN MADE!!!!!**"

In a July 24, 2002, letter after the partnership had been unsuccessful in getting a meeting with the OTC, the partnership informed the OTC that it planned to go forward with the development and/or sale of the property.

On August 13 and 26, 2002, the partnership met with staff members of the OTC, including OTC General Counsel Thomas Amato. The partnership presented the results of its appraisal report and an amount for the sale of the property that was less than the appraisal report's fair market value of $2,900,000.  There was no dollar amount presented for the partnership's consideration other than the OTC's initial offer of $93,800.

In September 2002 the OTC had the partnership's property appraised at $600,000.  The partnership was unaware of this appraisal until July 2003.

After negotiations failed, the partnership contacted the OTC on January 14, 2003, to withdraw its offer to sell the property for less than $2,900,000.  The partnership expressed frustration with the costly and time-consuming process and the OTC's followthrough.  The partnership further suggested that if the OTC wanted to acquire its property, it initiate such action as necessary to acquire it through appropriation.

C. <u>Appropriation Action</u>

On March 17, 2003, the OTC passed a "Resolution Declaring the Necessity of Appropriating Property and Directing the Proceedings to Effect Such Appropriation be Begun and Prosecuted". The resolution stated the OTC had negotiated for a reasonable time for the purchase but was unable to enter into an agreement, the OTC had complied with the relevant provisions of the Ohio Revised Code, and the property was necessary for the construction of an interchange. Before the OTC may bring an appropriation action, it is required to enter into good-faith negotiations with the property owner and offer to pay the property owner fair market value.

The OTC filed a "Complaint For Appropriation For Public Road Project, Quick Take Eminent Domain" on March 28, 2003, in the Court of Common Pleas in Lorain County, Ohio. The OTC requested a jury. The OTC deposited $93,800 with the Court and identified this amount as the fair market value of the property, although the OTC had obtained an appraisal report which determined the fair market value of the partnership's property was $600,000. As of March 28, 2003, the OTC had not offered the partnership any amount other than $93,800.

On June 11, 2003, the partnership's counsel wrote to the OTC and posed three questions pertaining to the involvement of the Ohio Department of Transportation, the type of the interchange,

and the construction of the ramp.  The information was needed for purposes of completing the partnership's second appraisal report.

On July 21, 2003, the partnership's counsel wrote to the outside counsel of the OTC regarding the documents produced and forwarded to the partnership.  The partnership had received an updated version of the OTC's appraisal report, and the updated appraisal report determined the fair market value of the property to be $600,000 instead of $93,800.  The OTC's certificate of appraisal, which stated the fair market value of the property to be $93,800, was dated February 24, 2001.  Unbeknownst to the partnership, the OTC's appraisal report had been updated on September 9, 2002 (approximately 7 months before the OTC filed its quick take action on March 28, 2003).  The partnership alleged the OTC had used a statutorily obsolete appraisal report in violation of Ohio State law.  The partnership further alleged the OTC had violated Ohio State law because of its knowledge that an application for rezoning was pending when it relied on the initial appraisal report (February 24, 2001), and the rezoning that occurred in July 2001 constituted a substantial change requiring a new appraisal report.  Finally, the partnership alleged the OTC had committed fraud upon the court by depositing only $93,800 as the determined fair market value when the OTC had an appraisal report estimating the fair market value of the property to be $600,000.

On July 22, 2003, the OTC agreed to pay the partnership an additional $511,000 within the week.  The OTC claimed it had made a "clerical" error and that was why it had not deposited the correct amount.  Before filing the appropriation action (March 28, 2003), the OTC had not offered to pay the partnership the updated fair market value of $600,000 for the property.

The partnership and the OTC entered into a settlement agreement on December 17, 2003.  The OTC agreed to pay the partnership $350,000 in addition to the $600,000 already offered for the property.  In addition, the settlement agreement acknowledged and recognized that the partnership would file a Form 8283, Noncash Charitable Contributions, with its 2003 return to indicate that the partnership had made a charitable contribution to the OTC as a result of the settlement of the litigation.  The OTC agreed that it would execute part IV of section B of Form 8283 entitled "Donee Acknowledgment".

The partnership filed a Form 8283 with its Form 1065 for 2003.  The partnership listed $1,591,000 as the fair market value of the appraised land as of December 17, 2003.  The partnership's appraiser, Richard Masters, signed Part III, Declaration of the Appraiser, and the OTC signed Part IV, Donee Acknowledgment, of section B.

II.  Fair Market Value:  Appraisals of the Property Transferred

The partnership's larger parcel of property, which directly abuts State Route 58, is approximately 150 acres and located in Amherst Township, Ohio.  Approximately 48.5 acres are zoned commercial (since rezoning in July 2001), and the remaining 101.5 acres are zoned agricultural/residential.[4]

The OTC taking had three components:  (1) Actual taking of approximately 12.4 acres of property, (2) restriction of access to State Route 58 from the property along approximately .470 acre by construction of a fence,[5] and (3) temporary easements on approximately .303 acre during construction of the interchange.

Four appraisal reports on the partnership's property were received into evidence, and three[6] were admitted as expert reports.  The following table lists the basic differences among the three expert reports:

---

[4]  The total number of acres owned by the partnership zoned commercial and zoned residential varied in each appraisal.  We state the respective acres used by each appraiser for purposes of explaining the determined fair market value.  We accept the allocation of acreage from Richard Masters' appraisal.

[5]  Approximately 846 feet of the partnership's property was accessible to and from State Route 58.  Since the OTC taking, approximately 506 feet of the partnership's property is accessible to and from State Route 58.  This resulted in a loss of 340 feet of exposure and access to State Route 58.

[6]  Appraisal reports by Richard Masters, Jay Arthur Berk III, and Richard Racek were admitted as expert reports.  The appraisal report by Wesley Baker was admitted as evidence for background purposes only.

|  | Masters | Berk | Racek |
|---|---|---|---|
| Date | 7/2/03 | 3/4/02 | 12/17/03 |
| Commissioned by | The partnership | The partnership | Respondent |
| Fair market value of taking | $1,591,000 | $2,875,726 | $953,671 |
| Fair market value per acre of commercial property | 77,000 (without frontage) 197,000 (with frontage) | 155,000 | 75,000 |
| Fair market value per acre of residential property | 21,300 | 22,000 | 17,500 |
| Trees | 13,678 | -- | -- |
| Damage | 905,000 | 1,674,550 | 309,399 |
| Temporary damage | 3,800 | 2,225 | 1,771 |

All three experts appraised the property subject to the OTC taking by using the sales comparison approach. This utilization approach recognizes the similarities and dissimilarities between the subject property and similar real property recently sold and makes appropriate adjustments relative to the subject property in estimating its indicated value. Each appraiser used the sale price per acre as the unit of comparison.

A. Masters' Appraisal

Richard D. Masters has been designated an MAI-SRA-ASA by the Appraisal Institute.  He issued an appraisal report for the partnership on July 21, 2003, based on a July 2, 2003, inspection.  He determined the fair market value of the OTC taking to be $1,591,000 as of July 2, 2003.  He signed the partnership's Form 8283.

Mr. Masters determined the highest and best use of the partnership's property was commercial and residential development.  The highest and best commercial development would be to create commercial lots facing State Route 58, build a service road with at least two lanes, and develop the remaining commercial property.  The highest and best use of the residential property would be residential development.

Mr. Masters valued the partnership's property in three parts because of its large size and to account for zoning differences.  First, Mr. Masters valued the partnership's commercial property with frontage on (abutting) State Route 58 because it would bring in the highest dollar from a buyer or buyers.  Then he valued the remaining commercial property.  Lastly, he valued all of the residential property as a whole.

1. Commercial Property With State Route 58 Frontage

Mr. Masters determined the partnership had approximately 9.7077 acres of commercial property with State Route 58 frontage.

He used four properties from recent sales as comparable properties. Two of the comparable properties were on State Route 58, and the other two were on main thoroughfares. In weighing the properties as comparables, he considered the time that had passed since the sales, financing terms, size, location, land size, easements, topography, utilities, zoning, and composite. The range of price per acre that the comparable properties sold for was $135,747 to $241,379. After he made adjustments for location, land size, and composite, the range of the sale prices per acre was $156,109 to $217,241. The comparable property on State Route 58 in Amherst Township (the partnership's property is in Amherst Township) sold for $195,652 per acre in July 2001, and Mr. Masters placed the most weight on this property because of its proximity to the partnership's property. Mr. Masters determined the partnership's commercial property with State Route 58 frontage was worth $197,000 per acre.

No commercial property with State Route 58 frontage was permanently taken from the partnership. However, as a result of the OTC's taking access to State Route 58, some of the commercial property became restricted. A local zoning ordinance requires commercial lots to have 175 feet of frontage. The OTC taking reduced the frontage along State Route 58 from 846 feet to 506 feet by construction of a fence between the partnership's property and State Route 58. Accordingly, the OTC taking reduced

the maximum number of commercial lots with State Route 58 frontage from four to two.[7]

Mr. Masters determined that two commercial lots with sufficient frontage would occupy 4.8 acres and be worth $197,000 per acre. Accordingly, the 4.9077[8] acres that had been worth $197,000 per acre before the OTC taking were no longer worth that amount because there was no access to State Route 58, and/or there was insufficient frontage for a commercial lot in Amherst Township. Mr. Masters determined these 4.9077 acres were properly valued with the remaining commercial property without State Route 58 frontage after the OTC taking.

Additionally, Mr. Masters determined a temporary easement on 0.071 acre of the partnership's commercial property with State Route 58 frontage had a value of $2,797[9] and included this amount in valuing the OTC taking.[10]

---

[7] Frontage of 846 feet would produce four potential commercial lots with 175 feet of frontage each (846 divided by 175 equals 4.8). Frontage of 506 feet would produce only two commercial lots (506 divided by 175 equals 2.9).

[8] 9.7077 acres less 4.8 acres.

[9] 0.071 acre times $197,000 per acre times 10 percent times 2 years equals $2,797.

[10] The temporary damage to commercial property with State Route 58 frontage ($2,797) plus temporary damage to residential property ($988) equals $3,785, which Mr. Masters rounded to $3,800.

   2.  Commercial Property Without State Route 58 Frontage

Mr. Masters determined the partnership had 38.3941 commercial acres without State Route 58 frontage before the OTC taking.  Mr. Masters used five sales of comparable properties which ranged in price per acre from $43,711 to $223,521.  In weighing the properties as comparable to the partnership's property, he considered and made adjustments for the time that had passed since each sale, financing terms, size, location, land size, easements, topography, utilities, zoning, and composite. The adjusted range of prices per acre for the comparable properties was between $48,191 and $90,034, the median price was $77,100, and the mean was $73,100.  Mr. Masters established a pre-taking value of $77,000 per acre for the partnership's commercial property without frontage.  Mr. Masters determined that before the taking the partnership's commercial property without frontage was worth $2,956,000.[11]

Mr. Masters determined approximately 7.3139 acres of the partnership's commercial property without State Route 58 frontage was taken in the OTC taking.  Mr. Masters valued the loss of this commercial property at $563,000 using his determined value of $77,000 per acre.

Mr. Masters then determined a post-taking value of $67,400 per acre for commercial property without frontage, using a new

---

[11]  38.3941 acres times $77,000 equals $2,956,346.

set of sales of comparable properties.  Mr. Masters believed determining a post-taking value per acre of the partnership's commercial property without frontage was appropriate because he concluded a major problem with access to commercial land would occur after the OTC taking.  He concluded that a possible solution would be the construction of a two-or-more-lane access/service drive to the remaining site area providing commercial access for future development.

Mr. Masters determined the partnership's remaining 36.3773[12] commercial acres without State Route 58 access were worth $2,452,000.[13]

### 3. Residential Property

Mr. Masters determined the partnership had approximately 103.4970 residential acres before the taking.  Mr. Masters used five sales of comparable properties in which the sale prices per acre ranged from $23,422 to $36,709.  In weighing the comparable properties, he considered the time that had passed since each sale, financing terms, size, location, land size, easements,

---

[12]  Before the taking, the partnership had 38.3941 acres. The OTC took 7.3139 acres from the partnership, and then Mr. Masters reclassified 4.9077 acres of commercial property with frontage to commercial property without frontage.  38.3941 minus 7.3139 plus 4.9077 equals 35.9879.  (The discrepancy between 36.3773 and 35.9879 acres appears to be the result of rounding, and this discrepancy has no effect as to the outcome of the case.)

[13]  36.3773 acres times $67,400 per acre equals $2,451,830. Mr. Masters rounded this to the nearest thousand.

topography, utilities, zoning, and composite. As adjusted by Mr. Masters to reflect the location, land size, and composite, the adjusted sale prices per acre ranged from $18,254 to $29,367, the median price was $26,250 per acre, and the mean price was $25,182 per acre. Mr. Masters placed greater weight on properties closer and more similar in size to the partnership's property. Mr. Masters determined a value of $21,300 per acre for the residential land, and the partnership's residential property was worth $2,204,000[14] before the OTC taking.

Mr. Masters determined the OTC took approximately 5.0796 residential acres, and this land was worth $108,000.[15] Mr. Masters' post-taking value per residential acre was the same as his pre-taking value per residential acre. Accordingly, Mr. Masters determined the value of the partnership's remaining 98.4174[16] acres of residential property to be $2,097,000 after the taking.[17]

---

[14] 103.4970 times $21,300 is $2,204,486, rounded down to $2,204,000.

[15] 5.0796 acres time $21,300 equals $108,195.

[16] 103.4970 residential acres before the taking less 5.0796 acres taken equals 98.4174 acres.

[17] 98.4174 acres times $21,300 equals $2,096,291.

In addition Mr. Masters determined the temporary easement on 0.232 acre of residential property for 2 years was worth $988.[18] Further, Mr. Masters valued the trees on property taken by the OTC to be worth $13,768, using a count of the number of trees, the type, and the average diameter.

### 4. Taking and Damages

On the basis of his calculations, Mr. Masters determined the pre-taking value of the partnership's property to be $7,086,000.[19] He determined the post-taking value of the partnership's property to be $5,495,000.[20] Accordingly, the $1,591,000 difference was composed of a total taking of $686,000[21] and damages of $905,000.[22]

---

[18] 0.232 acre times $21,300 per acre times 10 percent times 2 years equals $988.

[19] Rounded sum of: 9.7077 commercial acres with frontage times $197,000; 38.3941 commercial acres without frontage times $77,000; 103.4970 residential acres times $21,300 plus $13,000 trees.

[20] Rounded sum of: 4.8 commercial acres with frontage times $197,000; 36.3773 commercial acres without frontage times $67,400; 98.4174 residential acres times $21,300.

[21] Rounded sum of: 7.3139 commercial acres without frontage times $77,000; 5.0796 residential acres times $21,300; trees worth $13,768; temporary 2-year easement on 0.071 commercial acre with frontage worth $2,797; temporary 2-year easement on 0.232 residential acre worth $988.

[22] $1,591,000 less $686,000.

B.  Berk Appraisal

Jay Arthur Berk III holds a senior residential appraiser designation and is certified by the State of Ohio as a general appraiser.  He issued an appraisal report for the partnership on April 18, 2002, that was based on March 4 and April 16, 2002, inspections.  His appraisal report determined the value of the OTC taking to be $2,875,726 on March 4, 2002.

Mr. Berk determined the general area of the partnership's property is in the direct path of commercial outgrowth from Amherst, Ohio, and the completion of a sewer project together with good access to employment centers makes the partnership's property prime for development.  He determined the highest and best use of the property would be to split commercial lots from the State Route 58 frontage and to develop the residential land in phases.

Mr. Berk valued the partnership's property in two parts, commercial and residential, to account for the different zoning. He used the sales comparison approach and determined two possible values for the OTC taking.  One value reflected the position that all of the partnership's property would be affected by the taking; the other value reflected the position that not all of the partnership's property would be affected by the taking.  Mr. Berk did not express a view on which value was more persuasive; rather, he stated that the arguments for the one value were as

reasonable as those for the other. Mr. Berk did not explain his methodology in determining which acres would be affected by the taking.

Mr. Berk's determined acreage differed slightly from those of the other appraisals. He determined the partnership's property was 152.15 acres before the OTC taking (46.93 acres of commercial property and 105.22 acres of residential property). Mr. Berk determined the net taking was 12.414 acres (6.93 acres of commercial property and 5.53 acres of residential property).[23] After the taking, the partnership was left with 40 acres of commercial property and 99.69 acres of residential property.

### 1.  Commercial Property

Mr. Berk used two sales of comparable properties to determine the per-acre value of the partnership's 46.93 acres of commercial property. Those properties were sold for $149,176 per acre and $222,340 per acre. In weighing the comparable properties, he considered the conditions of each sale (i.e., arm's length), the time that had passed since the sale, the location, and the demolition costs. Mr. Berk made adjustments to sale prices of the comparable properties to take into account differences in demolition costs and location, and he calculated adjusted prices per acre of $151,600 and $156,800. On the basis of these two sales and the current market activity in the area of

---

[23]  6.93 plus 5.53 equals 12.46 and not 12.414.

the partnership's property, Mr. Berk determined the partnership's commercial property was worth $155,000 per acre and calculated a total value of $7,274,000.[24]

To determine the value of the OTC taking, Mr. Berk first determined the price per acre the partnership's affected commercial property would be worth after the OTC taking of 6.93 commercial acres. Mr. Berk used three comparable properties which sold for $43,711 per acre, $19,820 per acre, and $69,952 per acre. After he made adjustments to the sale prices to account for location and sewer, the adjusted prices per acre were $43,500, $27,000, and $49,000. In determining the value of the partnership's affected commercial property, Mr. Berk noted that the first comparable property (prices per acre of $43,711 unadjusted and $43,500 adjusted) had many of the same characteristics as the partnership's commercial property. Accordingly, Mr. Berk determined the partnership's affected commercial property was worth $43,000 per acre.

Instead of placing a single value on the partnership's commercial property after the OTC taking, Mr. Berk determined two potential values. The first value was based on the conclusion that all of the partnership's commercial property was affected by the OTC taking, and, accordingly, the 40 commercial acres

---

[24] 46.93 acres times $155,000 equals $7,274,000.

remaining were worth $1,720,000[25] after the OTC taking. The second value was based on the conclusion that only a portion of the partnership's commercial property was affected by the OTC taking. Accordingly, only the affected portion of the partnership's commercial property was valued at the reduced price per acre, and the remaining unaffected commercial property was valued at the higher (pre-OTC taking) price per acre. Citing an unidentified drawing as authority, Mr. Berk determined 12.95 commercial acres were affected and this left 27.05 commercial acres not affected by the OTC taking. Accordingly, Mr. Berk determined that after the OTC taking the partnership's commercial property under the second scenario was worth $4,749,500.[26]

In the first scenario, the value of the commercial property taken is $5,554,000,[27] and in the second scenario the value of the commercial property taken is $2,524,500.[28]

### 2. Residential Property

Mr. Berk used three sales of comparable properties to determine the per-acre value of the partnership's 105.22 acres of residential property. The comparable properties were sold for

---

[25]   40 acres times $43,000 equals $1,720,000.

[26]   12.95 acres times $43,000 plus 27.05 acres times $155,000.

[27]   $7,274,000 less $1,720,000 equals $5,554,000.

[28]   $7,274,000 less $4,749,500 equals $2,524,500.

$36,584 per acre, $21,719 per acre, and $20,927 per acre. In weighing the comparable properties, Mr. Berk considered the conditions of each sale (i.e., arm's length), the time that had passed since the sale, the location, the demolition costs, and the site development. Mr. Berk made adjustments to the sale prices of the properties to take into account demolition costs and development costs associated with sales of the comparable properties and calculated adjusted prices per acre of $22,125, $21,900, and $21,400. On the basis of these sales, Mr. Berk determined the partnership's residential property was worth $22,000 per acre and calculated its total value to be $2,314,000.[29]

To determine the value of the OTC taking, Mr. Berk determined the price per acre the partnership's affected residential property would be worth after the taking of 5.53 residential acres. Mr. Berk used one sale of a comparable property abutting a State route for $12,088 per acre. He did not make any adjustments to the sale price. Mr. Berk determined that the partnership's affected residential property was worth $12,100 per acre.

Again, instead of placing a single value on the partnership's residential property after the OTC taking, Mr. Berk determined two potential values. The first value was based on

---

[29] 105.22 acres times $22,000 equals $2,314,000.

the conclusion that all of the partnership's residential property was affected by the OTC taking, and, accordingly, the 99.69 acres remaining were worth $1,205,000[30] on the basis of the affected value per acre of $12,100. The second value was based on the conclusion that only a portion of the partnership's residential property was valued at the reduced price per acre, and the remaining unaffected residential property was valued at the higher price per acre. Again citing an unidentified drawing as authority, Mr. Berk determined 22.65 residential acres were affected and this left 77.04 residential acres not affected by the OTC taking. Accordingly, Mr. Berk determined the value of the partnership's residential property after the OTC taking under the second scenario was $1,969,000.

In the first scenario, the value of residential property taken is $1,109,000,[31] and in the second scenario, the value of residential property taken is $345,000.[32]

C. Racek Appraisal

Richard G. Racek has received the M.A.I. designation from the Appraisal Institute. He issued an appraisal report on

---

[30]  99.69 acres times $12,100 equals $1,206,249. Mr. Berk appears to have rounded this number down to $1,205,000.

[31]  $2,314,000 less $1,205,000 equals $1,109,000.

[32]  $2,314,000 less $1,969,000 equals $345,000.

December 17, 2003, and determined the fair market value of the OTC taking was $953,671.

Mr. Racek concluded the highest and best use of the partnership's commercial property is development for commercial or retail purposes. He concluded the highest and best use of the partnership's residential property is development for residential or agricultural use until there is sufficient demand for a residential subdivision. We refer to the property as residential.

Mr. Racek used the sales comparison method to separately determine the fair market values of the partnership's commercial and residential property. Mr. Racek determined before the OTC taking the partnership's property was 147.72 acres (48.5 acres zoned commercial and 99.22 acres zoned residential). He determined that the partnership lost 12.4 acres of property in the OTC taking (7.4 commercial acres and 5 residential acres).

1. Commercial Property

Mr. Racek used four sales of comparable properties to determine a price per acre for the partnership's commercial property. The range in prices per acre for the sales of comparable properties was from $44,405 to $99,202. Mr. Racek did not list the factors he considered in conducting his sales comparison analysis of the properties and made undisclosed plus and minus adjustments to the sale prices of the comparable

properties to reflect location, time, inflation, land size difference, and commercial exposure. After making these adjustments, he determined the partnership's commercial property was worth $75,000 per acre, and the 48.5 acres the partnership owned were worth $3,637,500.[33] Using this value per acre, he determined the partnership lost $555,000[34] of commercial property.

Mr. Racek determined the OTC taking would not have a meaningful effect on the commercial property still owned by the partnership after the OTC taking. Particularly since the commercial property was then vacant, he determined there would be no meaningful effect on the commercial residue. However, to value the commercial property remaining after the OTC taking, Mr. Racek determined a post-taking value per commercial acre of $67,500. The post-taking value reflects a discount of 10 percent, a subjective number Mr. Racek determined on the basis of his experience. Accordingly, he determined the value of the partnership's remaining 41.1 commercial acres after the OTC taking was $2,774,250.[35]

---

[33] $75,000 times 48.5 equals $3,637,500.

[34] $75,000 times 7.4 equals $555,000.

[35] $67,500 times 41.1 equals $2,774,250.

2.  Residential Property

Mr. Racek used four sales of comparable properties to determine a price per acre for the partnership's residential property.  The range in prices per acre for the sales of comparable properties was from $15,863 to $25,510.  Mr. Racek did not list the factors he considered in conducting his sales comparison analysis and made undisclosed plus and minus adjustments to the sale prices of the comparable properties to reflect land size difference and time since sale.  After making these adjustments, he determined the partnership's residential property was worth $17,500 per acre, and the 99.22 acres the partnership owned were worth $1,736,350.[36]  Using this value per acre, he determined the value of residential property the partnership lost in the OTC taking was $87,500.[37]

Mr. Racek determined the OTC taking would not have a meaningful effect on the residential land still owned by the partnership after the OTC taking.  He determined the post-taking value per acre of the residential property did not differ from the pre-taking value per acre.  Accordingly, he determined the

---

[36]  $17,500 times 99.22 equals $1,736,350.

[37]  $17,500 times 5 equals $87,500.

value of the partnership's remaining 94.22 residential acres was
$1,648,850.[38]

### 3. Damage

According to Mr. Racek, the difference between the value of
the partnership's property before the taking, $5,375,000, and
after the taking, $4,423,100, is $951,900.  Of this amount,
$642,500[39] resulted from the value of the property actually taken
as determined by Mr. Racek.  After subtracting $1 for "Value of
P.R.O.", Mr. Racek determined the permanent damage to the residue
of the partnership's property resulting from the OTC taking to be
$309,399.[40]

Additionally, Mr. Racek determined the temporary damage to
the residue to be $1,771.  For 24 months, .071 commercial acre
and .232 residential acre would be taken for construction by the
OTC.  He determined the value of this taking by multiplying the
acreage taken times the post-taking value per acre times 20
percent and placed a value of $959 on the temporary commercial
taking and $812 on the temporary residential taking.

After adding the value of property taken ($642,500), P.R.O.
($1), permanent damage to the residue ($309,399), and temporary

---

[38]  $17,500 times 94.22 equals $1,648,850.

[39]  ($75,000 times 7.4 commercial acres) plus ($17,500 times
5 residential acres) equals $642,500.

[40]  $951,900 less $642,500 less $1 equals $309,399.

damage ($1,771), Mr. Racek determined the value of the OTC taking was $953,671.

D.  Baker Appraisal

Wesley Baker performed an appraisal of the property on the basis of inspections occurring on October 16, 2000, February 24, 2001, September 3, 2002, and September 29, 2003.  He appraised the taken property at $771,000.

Neither side puts any special emphasis on this report, and neither do we.

III.  The Partnership's Apportionment of the Property's Adjusted Basis

On its Form 8283 the partnership identified $246,647.62 as its adjusted basis in the property transferred to the OTC. Accordingly, the partnership reported a capital gain of $703,352[41] on its 2003 Form 1065.

Respondent asserts that the partnership must apportion the adjusted basis of the property pro rata between the sale/transfer portion and the charitable contribution portion.  As a result of this pro rata apportionment, respondent asserts that the partnership must report an additional capital gain of $99,372 (for total capital gain of $802,724 from the transaction)[42]

---

[41]  Amount received, $950,000, less adjusted basis, $246,647.62.

[42]  Amount received of $950,000 less $147,275 (alleged adjusted basis allocated pro rata to the sale/transfer portion,
                                                        (continued...)

resulting from a decrease of the adjusted basis attributable to the sale/transfer portion of the transfer.[43]

OPINION

The partnership has not claimed that it satisfied the requirements of section 7491(a)[44] to shift the burden of proof to respondent with regard to any factual issue.

Deductions are a matter of legislative grace, and the taxpayer has the burden of showing entitlement to any deduction claimed. New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).

Section 170(a) generally allows a taxpayer a deduction for any charitable contribution, as defined in section 170(c), made during the taxable year. Section 170(c) defines the term "charitable contribution" as "a contribution or gift" to or for

---

[42](...continued)
based on the partnership's claimed adjusted basis of $246,627.62 times $950,000 over $1,591,000).

[43] The pro rata amount allocated to the charitable contribution portion of the transfer is $99,372. It was calculated by multiplying the ratio of the charitable contribution, $641,000, to the fair market value, $1,591,000, times the total adjusted basis of the property, $246,647.62.

[44] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedures.

the use of certain specified organizations.  Respondent does not dispute that the OTC was a qualified recipient pursuant to section 170(c).

If a charitable contribution is made in property other than money, the amount of the taxpayer's contribution is the fair market value of the property at the time of the contribution. Sec. 1.170A-1(c)(1), Income Tax Regs.

A charitable contribution is deductible only if verified under regulations prescribed by the Secretary, sec. 170(a)(1), including certain substantiation requirements provided in section 1.170A-13(c)(2), Income Tax Regs.

A taxpayer may not deduct a payment, such as the transfer of property herein, as a charitable contribution if the taxpayer receives a substantial benefit in return.  United States v. Am. Bar Endowment, 477 U.S. 105, 116-117 (1986); Ottawa Silica Co. v. United States, 699 F.2d 1124, 1131 (Fed. Cir. 1983); Singer Co. v. United States, 196 Ct. Cl. 90, 449 F.2d 413, 420, 422 (1971); S. Rept. 1622, 83d Cong., 2d Sess. 196 (1954).  If the size of a taxpayer's payment to a charity is clearly out of proportion to the benefit received, the taxpayer may claim a charitable contribution deduction equal to the difference between the payment and the market value of the benefit received in return, on the theory that the payment has the "dual character" of a purchase and a contribution.  United States v. Am. Bar Endowment,

supra at 117. To be deductible a charitable contribution must be a gift; i.e., a transfer of property without adequate consideration. Sec. 170(c); United States v. Am. Bar Endowment, supra at 118; Sklar v. Commissioner, T.C. Memo. 2000-118, affd. 282 F.3d 610, 612 (9th Cir. 2002). Thus, a portion of a payment is deductible as a charitable contribution under section 170 if the following two conditions are met: "First, the payment is deductible only if and to the extent it exceeds the market value of the benefit received. Second, the excess payment must be 'made with the intention of making a gift.'" United States v. Am. Bar Endowment, supra at 117-118 (quoting Rev. Rul. 67-246, 1967-2 C.B. 104, 105); Sklar v. Commissioner, supra at 621.

Respondent asserts the partnership received an amount equal to the fair market value of the taking, lacked the requisite donative intent when it transferred the land to the OTC, and failed to satisfy the substantiation requirements of section 1.170A-13(c)(2), Income Tax Regs. Alternatively, respondent asserts, if the fair market value of the taking exceeded the money received, then the partnership failed to make the requisite pro rata apportionment of adjusted basis to the sale portion of the transaction. We conclude the fair market value of the property transferred to the OTC exceeded the amount the partnership received, the partnership did have donative intent when it transferred the property to the OTC, the partnership

substantially complied with the substantiation requirements of section 1.170A-13(c)(2), Income Tax Regs., and the partnership is required to make a pro rata apportionment of its adjusted basis.

I.  Value of the Property Transferred

The partnership bears the burden of proving that the fair market value of the transferred property exceeds the value determined by respondent.  See Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933); Estate of Gilford v. Commissioner, 88 T.C. 38, 50-51 (1987); McGuire v. Commissioner, 44 T.C. 801, 806-807 (1965).

The parties rely on expert testimony to value the partnership's land taken by the OTC.  We evaluate expert opinion in the light of all the evidence in the record and may accept or reject the expert testimony, in whole or in part, according to our own judgment.  See Helvering v. Natl. Grocery Co., 304 U.S. 282, 295 (1938); Estate of Mellinger v. Commissioner, 112 T.C. 26, 39 (1999).  "The persuasiveness of an expert's opinion depends largely upon the disclosed facts on which it is based." Estate of Davis v. Commissioner, 110 T.C. 530, 538 (1998).  We may be selective in our use of any part of an expert's opinion. See id.

Fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having

reasonable knowledge of the relevant facts.  Sec. 1.170A-1(c)(2), Income Tax Regs.  The fair market value of property reflects the highest and best use of the property on the relevant valuation date.  Stanley Works v. Commissioner, 87 T.C. 389, 400 (1986).  Any realistically available special use of property due to its adaptability to a particular business is an element that must be considered in determining the fair market value thereof.  Mitchell v. United States, 267 U.S. 341, 344-345 (1925); Stanley Works v. Commissioner, supra.  The fair market value of property is not affected by whether the owner actually has put the property to its highest and best use.  The realistic, objective potential uses for property control the valuation thereof.  Stanley Works v. Commissioner, supra.

The partnership presented testimony of two expert witnesses, Richard D. Masters and Jay Arthur Berk III.  Respondent presented testimony of one expert witness, Richard G. Racek.  The significant differences between the partnership's experts and respondent's expert can be found in the following factors:  (1) The appraisal of property zoned for commercial use, (2) the appraisal of property zoned for residential use, and (3) the damage calculations.  See table supra p. 15.  We will attempt to reconcile these differences in reaching our determination as to the fair market value of the property.

A.  Appraisal of the Property

    1.  Application of the Sales Comparison Approach

Each appraisal report used the comparable sales method to determine a fair market value per acre of the partnership's property.  The comparable sales method involves gathering information on sales of property similar to the subject property, then making adjustments for various differences between the comparables and the property being appraised.  Estate of Spruill v. Commissioner, 88 T.C. 1197, 1229 n.24 (1987).

Mr. Masters determined two prices per acre for the partnership's commercial property:  Commercial property with frontage along State Route 58 and commercial property without frontage along State Route 58.  Mr. Berk and Mr. Racek did not separately value the commercial property with and without State Route 58 frontage; rather, each determined a value per acre of the commercial property as a whole.

Respondent asserts that by separately valuing the commercial acres with State Route 58 frontage Mr. Masters has improperly determined the fair market value using the subdivision development method.  The subdivision development method determines the value of undeveloped land by treating the land as if it were subdivided, developed, and sold.  Glick v. Commissioner, T.C. Memo. 1997-65.  From the proceeds of the sale development costs are then subtracted.  Id.  Finally, the

expected net proceeds are discounted over the estimated period required for market absorption of the developed lots in order to determine the amount a developer would pay for the undeveloped property; i.e., the property's fair market value. Branch v. Commissioner, T.C. Memo. 1987-321.

Respondent's assertion is based on a misunderstanding of the subdivision development method. Although Mr. Masters does refer to the loss of commercial lots with State Route 58 frontage, this is not a subdivision. Rather, because of minimum frontage restrictions on commercial lots, in order to accurately value the OTC taking it was reasonable for Mr. Masters to determine the number of commercial lots with State Route 58 frontage before and after the taking. Mr. Masters' valuation is not based on the assumption that the lots have been developed and sold; rather, the value per acre is simply a reflection of the location of the property. It is not necessary for Mr. Masters to subtract any development costs from his determined value of the commercial property with State Route 58 frontage because he did not include development in his determination.

By separately valuing the commercial property with State Route 58 frontage and without State Route 58 frontage, Mr. Masters has more accurately applied the sales comparison method to the partnership's commercial property. Respondent's own expert stated that commercial acres bordering a freeway are worth

more than the commercial acres not bordering a freeway. Accordingly, it was proper to separately value the commercial property with State Route 58 frontage and the commercial property without State Route 58 frontage and use a separate set of sales of comparable properties to determine the fair market values.

2. Price Per Acre for Commercial Zoned Property With State Route 58 Frontage

We are satisfied with the comparable properties Mr. Masters used to determine a price per acre for the partnership's commercial property with State Route 58 frontage. In particular, we find the sale of property on State Route 58 in Amherst Township for $195,652 per acre in July 2001 especially relevant to valuing the partnership's commercial property with State Route 58 frontage. Mr. Masters did not make any adjustments to the sale price per acre of this comparable property and gave it greater weight in determining the value of the partnership's commercial property with State Route 58 frontage to be $197,000 per acre. We agree with Mr. Masters that the partnership's commercial property with State Route 58 frontage was worth $197,000 per acre.

We also agree with Mr. Masters' reclassification of approximately 4.9077 acres of the partnership's commercial property. Although no actual acreage of commercial property with State Route 58 frontage was taken, access to State Route 58 from part of the property became restricted because of the building of

a fence, and some of the partnership's property lost the attribute, which justified a separate valuation. Using local minimum frontage requirements, Mr. Masters concluded the fence reduced the number of potential commercial lots from four to two, and he reclassified 4.9077 acres as commercial property without State Route 58 frontage. This was proper and values the commercial development opportunity that was foreclosed as a result of the OTC taking.

### 3. Price Per Acre for Residual Commercial Zoned Property (Pre-Taking)

Mr. Masters determined a pre-taking value of $77,000 per commercial acre without State Route 58 frontage (residual commercial property), Mr. Berk determined a pre-taking value of $155,000 per commercial acre, and Mr. Racek determined a pre-taking value of $75,000 per acre. We place greater weight on the sales comparison analysis conducted by Mr. Masters.

Mr. Masters' analysis is more thorough. He considered more factors which could potentially warrant an adjustment to the sale price of a comparable property, he included more sales of comparable properties in his analysis, and he explained and disclosed the adjustments he made to the sale prices of properties and the weight he awarded to particular sales. He used five sales of comparable properties in his analysis and considered 10 factors for adjustment. Although Mr. Berk explained his adjustments to the comparable properties' sale

prices and disclosed the amounts of those adjustments, he used sales of only two properties in his comparables analysis. Mr. Racek used nearly as many sales of comparable properties (four) as Mr. Masters, but he did not explain the adjustments he made to the sale prices or even disclose the amounts of the adjustments. Mr. Racek simply stated a plus or minus adjustment was necessary to a particular sale without stating the amount.

Further, we place greater weight on Mr. Masters' analysis because the sales of comparable properties on which he relied were specifically tailored to valuing the residual commercial property. Both comparable properties used by Mr. Berk were along State routes, and he determined a much higher price per acre. It appears that he did so because he did not separately value the portion of the partnership's commercial property with State Route 58 frontage. Accordingly, we accept Mr. Masters' determination that the partnership's residual commercial property was worth $77,000 per acre.

4. Price Per Acre for Residential Zoned Property (Pre-Taking)

Mr. Masters determined a pre-taking value of $21,300 per residential acre, Mr. Berk determined a pre-taking value of $22,000 per residential acre, and Mr. Racek determined a pre-taking and post-taking value of $17,500 per residential acre. We note that the determined values are much closer in value to one another than are the commercial values determined by these

experts.  We place greater weight on the comparables analysis conducted by Mr. Masters.

For reasons similar to those mentioned above, we find Mr. Masters' analysis to be the most thorough because he considered the most factors which could potentially warrant an adjustment to the sale price of a comparable property, he included the most sales of comparable properties in his analysis, and he explained and disclosed the adjustments he made to the sale prices of comparable properties and the weight awarded to particular sales. Although Mr. Berk included more sales of comparable properties in his commercial analysis (three) than in his residential value analysis, he did not consider as many factors as Mr. Masters did in making adjustments to the sale prices.  Mr. Racek included four sales of comparable properties in his residential value analysis but disclosed only the factors which called for him to make adjustments to the sale prices of the properties and did not disclose the amounts of the plus and minus adjustments he made. We accept Mr. Masters' determination that the partnership's residential property was worth $21,300 per acre.

### 5. Commercial Post-Taking Value Per Acre

Each appraiser determined that the value of the partnership's remaining commercial property decreased after the OTC taking.  Mr. Masters determined the per-acre value fell from $77,000 to $67,400, Mr. Berk determined the per-acre value fell

from $155,000 to $43,000 (affected), and Mr. Racek determined the per-acre value fell from $75,000 to $67,500. Mr. Masters and Mr. Berk used a sales comparison analysis to determine the post-taking price per acre, and Mr. Racek did not. Instead, Mr. Racek reduced the pre-taking value per commercial acre by 10 percent. For the reasons stated above, we find Mr. Masters' sales comparison analysis to be more comprehensive in factors and number of sales considered than Mr. Berk's sales comparison. Accordingly, we accept Mr. Masters' post-taking value per commercial acre of $67,400.

### 6. Residential Post-Taking Value Per Acre

Mr. Masters determined that the per-acre value of the partnership's residential property did not decrease after the OTC taking, on the basis of his sales comparison analysis of five sales of comparable properties. Mr. Berk determined that the value of the partnership's remaining residential property decreased after the OTC taking. He concluded the partnership's remaining residential property fell in per-acre value from $22,000 to $12,100 after the OTC taking. Mr. Berk determined on the basis of a comparison to the sale of one comparable property. Mr. Racek determined there was no change in per-acre value because the residential acreage is unaffected by the taking. For the reasons stated above, we find Mr. Masters' sales comparison to be more comprehensive in factors and number of sales

considered than Mr. Berk's sales comparison.  Accordingly, we accept Mr. Masters' post-taking value per residential acre of $21,300.

　　　　7.  Damages

Mr. Masters determined that as a result of the OTC taking the partnership suffered damages of $905,000.  He determined this by first calculating the difference between his estimated values of the partnership's property before and after the OTC taking, then, subtracting from the difference his estimated value of the land taken.  To determine the value of the land taken, he multiplied his estimated per-acre price by the number of acres taken for each respective type of property, i.e., commercial and residential.

Mr. Berk determined damages of $1,674,550.  He determined this in a calculation similar to Mr. Masters':  first, by calculating the difference between his estimated values of the partnership's property before and after the OTC taking, and then subtracting from the difference his estimated value of the land taken.

Mr. Racek determined damages of $309,399.  He determined this in a calculation similar to Mr. Masters':  first, by calculating the difference between his estimated values of the partnership's property before and after the OTC taking, and then

subtracting from the difference his estimated value of the land taken.

Using the values of the partnership's land as determined by Mr. Masters, we determine that the partnership suffered approximately $934,408 in damages as a result of the taking. The amount of damage the partnership suffered is from the reclassification of 4.9077 acres of commercial property and loss in value of the commercial property without frontage.

After the taking, approximately 4.9077 acres of commercial property with frontage were reclassified to commercial property without frontage, and this resulted in a $120,000 decrease in value per acre for these acres. We find this reclassification was appropriate and resulted in approximately $588,924 of damage.

Additionally, after the taking, the value of the partnership's commercial property without frontage decreased $9,600 per acre. The partnership started with 38.3941 acres of commercial property without frontage, the OTC took 7.3139 acres, and 4.9077 acres were added as a result of their reclassification as commercial property without frontage; the partnership was left with 35.9879 acres of commercial property without frontage after the taking. Accordingly, the decrease in value of these 35.9879 acres resulted in damages of $345,484. The sum of these two sources of damages is $934,408, and we determine the partnership suffered damage as a result of the taking in that amount.

### 8. Reconciliation of Amounts

We accept Mr. Masters' determinations of the per-acre fair market values of the partnership's property before and after the taking. The OTC took 7.3139 acres of commercial property without frontage worth $77,000 per acre, 5.0796 acres of residential property worth $21,300 per acre, and timber and temporary easements worth $17,553. The value of the taken acres, timber, and easements is approximately $688,918. When added to the damage of $934,408, we determine the value of the property taken by the OTC to be $1,623,326; the value taken exceeded the $950,000 of compensation paid to the partnership by $673,326.[45]

## II.  Charitable Intent of the Partnership

As used in section 170(a), the term "charitable contribution" is synonymous with the word "gift". DeJong v. Commissioner, 36 T.C. 896, 899 (1961), affd. 309 F.2d 373 (9th Cir. 1962). A gift is generally defined as a voluntary transfer of property by the owner to another without consideration. Id. A gift is the expression of a detached and disinterested generosity. Commissioner v. LoBue, 351 U.S. 243, 246 (1956). It is motivated by affection, respect, admiration, charity, or like impulses. Robertson v. United States, 343 U.S. 711, 714 (1952).

---

[45]  We note this amount is higher than the amount the partnership claimed for a charitable contribution deduction.

It is not compelled by the constraining force of any moral or legal duty.  Bogardus v. Commissioner, 302 U.S. 34, 41 (1937).

We heard three witnesses testify as to the charitable intent of the partnership in negotiating the transfer of the property to the OTC.  Steven Luca testified on behalf of the partnership, and Joseph DiSantis and Noel Tsevodos testified on behalf of respondent.  At the time of trial, Ms. Tsevodos was the general counsel of the OTC.

As a trier of fact it is our duty to listen to the testimony, observe the demeanor of the witnesses, weigh the evidence, and determine what we believe.  See Christensen v. Commissioner, 786 F.2d 1382, 1383-1384 (9th Cir. 1986), affg. in part and remanding on another issue T.C. Memo. 1984-197; Nell v. Commissioner, T.C. Memo. 1986-246.  At trial we had the opportunity to evaluate Mr. Luca's, Mr. DiSantis', and Ms. Tsevodos' veracity and to observe their demeanor.  We found Mr. Luca to be a credible witness.  His testimony was straightforward and consistent with other evidence.  Mr. Luca credibly testified that it was the intention of the partnership to make a part gift and part sale, and the reason the partnership suggested an appropriation action was to ensure that the full fair market value of the property was recognized in the combination of the gift and sale.  We have given great weight to his testimony in

determining that the partnership transferred the property with donative intent.

We did not find Mr. DiSantis and Ms. Tsevdos to be credible witnesses. Mr. DiSantis was evasive in his responses. Ms. Tsevdos was argumentative in her responses. Neither was able to credibly explain why the OTC did not offer to pay the partnership fair market value for the property when it was required to do so to engage in good faith negotiations. Further, neither was able to credibly explain why the OTC did not deposit the fair market value of the property as required by State law. We give little weight to their testimony that the partnership lacked donative intent in transferring the property.

The testimony of Mr. Luca and the partnership's correspondence in negotiating the transfer of the property to the OTC persuades us that the partnership made a gift to the OTC. The written correspondence between the partnership and the OTC demonstrates the partnership's commitment to supporting the OTC in its pursuits as a government entity and illustrates a pattern of offering a portion of the property as a gift to the OTC. On July 17, 2002, the partnership informed the OTC orally and in writing that the partnership was interested in a part-gift part-sale transfer of the property to the OTC. Again, on July 22, 2002, the partnership reminded the OTC about its offer to transfer the property in a part-gift part-sale transaction, and

on July 25 and August 28, 2001, the partnership reminded the OTC that it supported the OTC's activities.

Although respondent asserts the filing of the quick take action negates donative intent on the part of the partnership, the circumstances of the partnership's negotiations with the OTC do not support respondent's assertion. We find the OTC failed to negotiate in good faith when it did not offer to pay the partnership full fair market value. We find the partnership suggested the OTC file a quick take action as a last attempt to prompt good-faith negotiations on the part of the OTC and to have the full fair market value of the property recognized in a part-gift part-sale transaction. This intention, i.e., to have the full fair market value recognized by the OTC, does not negate the donative intent of the partnership because the partnership always intended a part-gift part-sale transaction.

The OTC failed to acknowledge the fair market value of the property to the partnership and prompted years of protracted negotiations not conducted in good faith by the OTC. After the OTC had orally offered to pay the partnership $200,000 for the property in 1999, in 2001 the OTC sent the partnership an offer of $93,800 for the property. After part of the property was rezoned commercial, the OTC did not disclose the new appraisal or increase the amount it was offering to pay the partnership. After the OTC received an appraisal report valuing the property

at $600,000, the OTC did not increase the amount it was offering to pay the partnership. The OTC never offered to pay the partnership an amount different from $93,800 until the partnership was forced to hire counsel and the partnership's counsel discovered the appraisal report, which determined the property to be worth $600,000, and brought it to the attention of the Court of Common Pleas in Lorain County.

The correspondence between the partnership and the OTC illustrates the frustration the partnership experienced in attempting to negotiate the terms for transferring the property to the OTC. The partnership made clear that it wanted to make a gift to the OTC of some portion of the land. An acknowledgment by the OTC of a higher fair market value would not necessarily have resulted in the OTC's being forced to pay the partnership more because some part of the property would be tendered as a gift. However, the OTC would not acknowledge the property had a fair market value other than $93,800 throughout negotiations and in spite of rezoning and an appraisal report which reported otherwise. Mr. Luca's testimony set forth the frustrating pattern of unfair negotiations by the OTC. We find the partnership suggested the OTC file an appropriation action merely to have a neutral party determine the fair market value of the property. The partnership intended to donate a portion of the

property to the OTC throughout the appropriation proceedings and did donate a portion of the property to the OTC.

Furthermore, the settlement agreement entered into by the OTC and the partnership includes a provision which recognizes that the partnership made a donation of a portion of the property to the OTC. The language is indicative of the partnership's donative intent and a gift. It is consistent with the partnership's pattern of correspondence expressing its intention to donate part of the property to the OTC. Accordingly, we find the partnership made a gift of $641,000 worth of property to the OTC in a part-gift part-sale transfer.

III. Substantiation Requirements

Section 1.170A-13(c)(2), Income Tax Regs., requires additional substantiation for charitable contributions of property worth more than $5,000. Specifically, section 1.170A-13(c)(2)(i), Income Tax Regs., requires a donor to: (1) Obtain a "qualified appraisal" for the property contributed; (2) attach a fully completed appraisal summary to the tax return on which the deduction for the contribution is first claimed by the donor, and (3) maintain records containing the information required by paragraph (b)(2)(ii) of this section (relating to content of records).

Section 1.170A-13(c)(3)(i)(A), Income Tax Regs., requires a "qualified appraisal" to be made not earlier than 60 days before

the date of contribution of the appraised property nor later than the due date of the return on which a deduction is first claimed under section 170.  As relevant here, section 1.170A-13(c)(3)(ii), Income Tax Regs., requires a "qualified appraisal" to include the date of contribution to the donee, a statement that the appraisal was prepared for income tax purposes, and the fair market value of the appraised property on the date of the contribution, among other information.  Sec. 1.170A-13(c)(3)(C), (G), (I), Income Tax Regs.  Respondent asserts the partnership has failed to substantiate its claimed charitable contribution deduction with a "qualified appraisal" because the appraisals it submitted are untimely and lacking required information.

We have previously allowed deductions for charitable contributions where taxpayers have substantially complied with the substantiation requirements of section 1.170A-13(c)(2) and (3), Income Tax Regs.  See Bond v. Commissioner, 100 T.C. 32 (1993); Simmons v. Commissioner, T.C. Memo. 2009-208.  In Bond this Court considered whether certain requirements of the above-referenced regulations were mandatory or directory and whether the taxpayer had substantially complied so as to be entitled to a charitable contribution deduction.  In reaching the conclusion that the requirements were directory, the Court expressed the following rationale:

> Under the above test we must examine section 170 to
> determine whether the requirements of the regulations are

mandatory or directory with respect to its statutory purpose.  At the outset, it is apparent that the essence of section 170 is to allow certain taxpayers a charitable deduction for contributions made to certain organizations. It is equally apparent that the reporting requirements of section 1.170A-13, Income Tax Regs., are helpful to respondent in the processing and auditing of returns on which charitable deductions are claimed.  However, the reporting requirements do not relate to the substance or the essence of whether or not a charitable contribution was actually made.  We conclude, therefore, that the reporting requirements are directory and not mandatory.  See Taylor v. Commissioner, * * * [67 T.C. 1071,] 1078-1079 [(1977)]. [Bond v. Commissioner, supra at 41.]

Bond involved the contribution of two blimps to a qualified

charity.  The parties agreed upon the value, the fact that the

appraiser was qualified, and all other regulatory requirements

except whether the taxpayers' failure to obtain and attach to

their return a separate written appraisal containing the

information specified in the regulations would result in the

disallowance of a charitable contribution deduction.  The Court

noted that substantially all of the information specified in the

regulations had been provided, except the qualifications of the

appraiser, on the Form 8283 attached to the return.  The Court

concluded that the taxpayers in Bond had substantially complied

with the regulations and that disallowance of the deduction under

those circumstances would be too harsh a sanction.

Subsequently, in Hewitt v. Commissioner, 109 T.C. 258

(1997), affd. without published opinion 166 F.3d 332 (4th Cir.

1998), the Court again considered these regulations in a

situation where taxpayers donated to a charitable organization

their shares of stock of a corporation that was not publicly traded. They claimed deductions in amounts that the parties agreed represented the fair market value of the stock. However, the taxpayers did not obtain appraisals before filing their returns for the years at issue. The values reported or deductions claimed were not based upon qualified appraisals; instead, they were based upon average per-share prices of the stock traded in arm's-length transactions at approximately the same time as the gifts. Even though the values were undisputed, the Court found that the taxpayers had not complied with section 170 and section 1.170A-13, Income Tax Regs., and that they were not entitled to deduct any amount in excess of the amount allowed by the Commissioner, which was their basis.

In Hewitt the Commissioner disallowed the value of the stock in excess of basis because of the lack of qualified appraisals. The Commissioner agreed that the taxpayers made charitable contributions, that the donee was charitable, and that the claimed values represented fair market values of the contributions. However, unlike the taxpayers in Bond, the taxpayers in Hewitt did not provide information on the Form 8283 that satisfied most of the requirements of the regulation. In holding that the taxpayers were not entitled to a deduction in excess of their basis (for the full fair market value), the Court provided the following rationale:

> Petitioners herein furnished practically none of the information required by either the statute or the regulations.  Given the statutory language and the thrust of the concerns about the need of respondent to be provided with appropriate information in order to alert respondent to potential overvaluations, * * * petitioners simply do not fall within the permissible boundaries of Bond v. Commissioner, supra, where an appraisal summary, which was completed by a qualified appraiser, contained most of the required information and could therefore be treated as a written appraisal, was attached to the return.  Cf. D'Arcangelo v. Commissioner, T.C. Memo. 1994-572 (respondent prevailed where no qualified appraisal was obtained). [Hewitt v. Commissioner, supra at 264.]

Taken together, Bond and Hewitt "provide a standard by which we can consider whether petitioners provided sufficient information to permit respondent to evaluate their reported contributions, as intended by Congress."  Smith v. Commissioner, T.C. Memo. 2007-368.

Respondent asserts the partnership's July 21, 2001, appraisal report from Mr. Masters is untimely (obtained more than 60 days before the December 17, 2003, date of contribution) and lacking some of the information required by the regulations (the date the partnership contributed the property to the OTC, a statement that the appraisal was prepared for income tax purposes, and the fair market value of the appraised property as of the date of contribution).  Respondent asserts the partnership is not entitled to a charitable contribution deduction because of these substantiation flaws and that it has not substantially complied with the regulations.  We conclude the partnership has substantially complied with the regulations and is entitled to a

$641,000 charitable contribution deduction for the property transferred to the OTC.

Similar to the taxpayer in Bond, the partnership timely provided respondent with nearly all of the information required in the regulations. Respondent was provided with the date of the contribution and the fair market value of the property on the date of contribution on the partnership's completed Form 8283. The appraisal did lack a statement that it was prepared specifically for income tax purposes; however, we find this omission to be insubstantial. See also Simmons v. Commissioner, supra (finding substantial compliance with section 170 income tax regulations) ("Although the appraisals did not contain an explicit statement that they were prepared for income tax purposes, the appraisals did contain statements that the owner of the parcels petitioner was contemplating donating conservation easements to L'Enfant.").

It is clear that the partnership did obtain an appraisal report before filing its tax return and claimed a charitable contribution deduction based on the fair market value in the appraisal report. Cf. Bond v. Commissioner, 100 T.C. at 42 ("Therefore, this is not a case where petitioners failed to obtain a timely appraisal of the donated property and thereby failed to establish its value for claiming a contribution deduction on their return."); Smith v. Commissioner, supra (where

an appraisal report submitted by the taxpayers was completed after the due date for filing the taxpayers' 2000 returns). Accordingly, we conclude the premature nature, by approximately 3 months, of the partnership's appraisal report was insubstantial.

The information provided to respondent was sufficient to permit respondent to evaluate the partnership's reported contribution and monitor and address concerns about overvaluation and other aspects of the reported charitable contribution. Accordingly, the partnership has substantially complied with the regulations.

IV.  Apportionment of the Property's Adjusted Basis

Section 1011(b) provides:  "If a deduction is allowable under section 170 (relating to charitable contributions) by reason of a sale, then the adjusted basis for determining the gain from such sale shall be that portion of the adjusted basis which bears the same ratio to the adjusted basis as the amount realized bears to the fair market value of the property."

The partnership subtracted the full adjusted basis ($246,648) of the property from the amount received ($950,000) and reported a $703,352 gain from the bargain sale.  Because section 170 applies to this transaction, section 1011(b) does not allow the partnership to subtract the full adjusted basis of the property.  Instead, the partnership may deduct only the amount of the adjusted basis proportional to the amount realized in the

part sale over the fair market value of the entire property. Accordingly, the partnership may subtract only an adjusted basis of $147,276[46] from the amount realized ($950,000), and the partnership must recognize an additional gain of $99,372.[47]

V.  Conclusion

We have found the partnership had donative intent when it transferred the property to the OTC, and it substantially complied with the substantiation requirements of section 1.170A-13, Income Tax Regs.  The partnership is entitled to a $641,000 charitable contribution deduction, the amount it claimed.  We also find that the partnership must make a pro rata apportionment of the adjusted basis of the property to the sale portion of the transaction.

To reflect the foregoing,

Decision will be entered

under Rule 155.

---

[46]  Amount realized on sale portion of bargain sale ($950,000) over total fair market value of property ($1,591,000) times total adjusted basis of $246,648.

[47]  New gain (amount realized, $950,000, less proportionate adjusted basis, $147,276) less old gain ($703,352).